## AMERICAN COLUMN & LUMBER COMPANY ET AL. *v.* UNITED STATES.

### APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF TENNESSEE.

No. 71. Argued October 20, 21, 1920; restored to docket for reargument February 28, 1921; reargued October 12, 13, 1921.—Decided December 19, 1921.

An " Open Competition Plan " under which manufacturers of one-third of the hardwood output of the country exchanged full and minute disclosures of the details of their business, including stocks on hand, production, shipments, prices, names of purchasers, etc., and their views on future market conditions, by means of reports and letters from the several members to a central office and distribution to them therefrom of analytical digests of the matters thus furnished; with significant suggestions as to future production and prices, by an expert agent, these means being supplemented by frequent meetings and discussions by the members,—is found from the evidence to have been actuated by the purpose and to have had the effect of restricting competition in interstate commerce by curtailing production and increasing prices, and is *held* a combination and conspiracy violating the Anti-Trust Act. P. 399.

263 Fed. 147, affirmed.

DIRECT appeal from a decree of the District Court granting a permanent injunction under the Anti-Trust Act.

*Mr. L. C. Boyle* and *Mr. G. Carroll Todd* for appellants.

The mere fact of association carries no presumption of guilt under the Sherman Act. Society itself is an organization, and does not object to organizations for social, religious, business, and all legal purposes. *Gompers* v. *Bucks Stove & Range Co.,* 221 U. S. 418, 439.

The interchange of stock, production and sales reports is not itself an unlawful act, and cannot by itself be evidence of unlawful conduct. *United States* v. *Reading Co.,* 183 Fed. 427.

Of the "booster" letters, it suffices to say that however pertinent they may be to the question whether the tendency of the reports is to enhance prices, the statements contain nothing whatsoever in the way of admissions of an agreement nŏt to compete or to curtail production. Indeed, exactly the same statements might have been made if the information contained in the reports had been furnished by the Government or any other independent agency.

The record shows that the rise in prices was brought about by natural causes: (1) By low stocks due to enforced inactivity of the saw-mills during the war; (2) by the final breaking loose of the pent-up demand; and (3) by reduced production due principally to abnormal rainfall in a large part of the hardwood section of the southern and southwestern States. Since this charge was made, and since the case was decided, a department of the Government itself, after careful study of the conditions, has reported that the rise in prices was due to these natural causes. Report on lumber industry made June 1, 1920, (by the Department of Agriculture, in response to Sen. Res. No. 311, 66th Congress, 2d sess.,) of which the court will take judicial notice. *Tempel* v. *United States,* 248 U. S. 121.

The members of the "Open Competition Plan" are divided into four geographical groups each of which holds a monthly meeting for the discussion of topics of interest to the industry. Prior to the meetings a questionnaire is addressed to the members of each group. The members reply or not as they see fit. On the average less than half do so. The replies from each group are summarized and compiled into a report, which is submitted to the group when it meets and constitutes the basis of discussion. These are the so-called "market condition reports."

The exchange of information and views on questions of the kind propounded is plainly within the right of asso-

ciation, as defined in *Hopkins* v. *United States,* 171 U. S. 578, and *Anderson* v. *United States,* 171 U. S. 604. The parts of these reports to which the Government particularly objected were the estimates of future production and the expressions of opinion as to market conditions in the near future. As to the latter, an examination of the responses will show that they carry not the slightest suggestion of fixing prices or regulating production by agreement. With regard to the estimates of future production, if the suggestion is that they were made for the purpose of limiting production, the evidence shows that the estimates of what future production would be exceeded actual production, that production in fact increased, and that the defendants were striving to produce to their full capacity, if for no other reason, to take advantage of the strong demand at high prices.

It is fanciful to suppose that these defendants, controlling less than a third of the output, would agree to curtail their production when the undisputed evidence is that there was a demand for full production at high prices. It is still more fanciful to suppose that there could have been any such agreement when there was the greatest disparity in the rate of production of the parties, some producing to the limit of their capacity, others at less than half, owing to varying conditions of weather, etc., and when this situation was regularly disclosed through the monthly production reports, and no protest was heard from the low-producing members.

The meetings were open to everybody; they were poorly attended, fewer than one-third of the members being present most of the time; the questionnaires and market condition reports were the basis of the discussions, which included such subjects as costs of manufacture, log supply, demand, standardization of grades, inspection, weather and labor conditions, collections, car supply, exports, advertising, etc. Inspection of the minutes will

make it plain that nothing was said at these meetings even approaching an agreement not to compete as to prices or to curtail production. Such references to prices or production as occurred were expressions of opinion by individuals such as are bound to occur unless men engaged in the same industry are forbidden to meet at all.

That the members had no such purpose as is charged is shown: (1) By the specific and circumstantial denials under oath of about fifty of the most active of them, *United States* v. *Reading Co.*, 226 U. S. 324, 346. (2) By the fact that at the very time when the members of the " Plan " are supposed to have been parties to agreements not to compete and to curtail production as a means of enhancing prices, leaders among them were attempting to hold prices down. (3) By the fact that not a single witness was produced from amongst the purchasers of hardwood lumber to testify that the defendants' prices were held higher than the conditions of supply and demand justified or that competition had been suppressed or production curtailed by agreements, notwithstanding that the Government had alleged in its complaint that purchasers were holding off in the belief that the prices demanded were too high. The absence of complaint by customers or competitors is a relevant circumstance in a case like this. *United States* v. *United States Steel Corporation,* 251 U. S. 417, 447; *United States* v. *American-Asiatic S. S. Co.,* 220 Fed. 230, 235. (4) By the affirmative testimony of representatives of important groups of customers that natural causes brought about the enhancement in prices and that they had seen no indications of suppression of competition amongst the defendants, but that on the contrary the great exertions of the latter to produce as much as possible and the marked variations in the prices quoted by them indicated the existence of competition. Testimony of this character was accorded great weight in the *Steel Case,* 223 Fed. 55, 88. (5) By

the fact that the prices of outside manufacturers, who controlled two-thirds of the production, moved in the same courses as the prices of the defendants. (6) By the sales reports themselves, which, so far from reflecting any agreement as to prices, disclose constant and substantial variations in the prices received by members at a given time for lumber of the same kind, grade, and thickness, customers testifying to the same variations. (7) By the production reports themselves, which show some members producing to the limit of their capacity; others much less than their capacity, principally because of bad weather conditions; and others at various stages in between. *United States* v. *Reading Co.,* 183 Fed. 427; 226 U. S. 324. (8) By the evidence, nowhere contradicted, that during the period of the alleged agreement to curtail production sales of machinery to hardwood lumber mills were on an unprecedented scale. (9) By the fact—stated by many witnesses, buyers and sellers alike, and denied by none, and since confirmed by an official report of the Department of Agriculture—that there were natural causes operating to produce high prices. (10) By the inherent improbability that, with the demand insistent and increasing and prices rising, the producers of less than a third of a commodity would agree to curtail their production, leaving the increased business and profits for their competitors.

The statements selected from the " market letters " by the Government are but a few taken here and there out of a great mass of comment on business conditions. The letters from which the sentences were taken were not secret communications, as would be expected if the purpose in writing them were to bring about an agreement to fix prices or curtail production, but were attached to the fly-leaf of the sales reports, which were filed with the Department of Justice, the Federal Trade Commission, and the Bureau of Forestry, and were also sent to several

statistical publications. This is not the way conspirators act.

Even construing certain of Mr. Gadd's statements as "recommendations" to maintain prices or to curtail production, or as "arguments" for higher prices, as the bill of complaint does, this does not make out a conspiracy without some evidence that the parties promised each other to act in accordance with such recommendations or arguments. *United States* v. *Webster,* District Court, S. D. N. Y., February, 1919, charge to jury by Hand, J.

It has not been shown that the alleged combination had the power to bring about the enhancement of prices charged against it. In the *Steel Case,* 251 U. S. 417, one hundred and eighty independent corporations, controlling approximately 50 per cent. of the steel trade, entered into a combination through a holding company, which the Government alleged to be in violation of the Sherman Act. 251 U. S. 439. This court adopted the finding of two of the judges below that the combination was organized for the illegal purpose of monopolizing the steel trade (251 U. S. 439, 442); but, agreeing with the same two judges, it also found that it was not shown that the combination "ever possessed or exerted sufficient power when acting alone to control prices of the products of the industry" (251 U. S. 440), or that it had "power in and of itself to fix and maintain prices" (251 U. S. 441), or that "the power of the corporation" ever reached to monopoly (251 U. S. 442); in other words, that it was not shown that the combination had the power to achieve its object, namely, monopoly or control of prices. It was held, therefore, that the combination did not violate the Sherman Act. See also *State* v. *Eastern Coal Co.,* 29 R. I. 254.

In *Chicago Board of Trade* v. *United States,* 246 U. S. 231, this court held that, in determining whether or not a particular business practice violates the Sherman Act, "the evil believed to exist, the reason for adopting the

particular remedy, the purpose or end sought to be obtained, are all relevant facts." Manufacturers of hardwood lumber were situated as wheat and cotton growers and cattle raisers would be if there were no general markets or governmental agencies to keep them informed of the conditions of supply and demand and of the movement of prices. To obtain the information made available in some industries through general markets and in others by the Department of Agriculture and to put themselves on a footing of equality in bargaining with the wholesale dealers and other large buyers, in short, to be able to conduct their business in the light of the facts surrounding the industry and not be compelled to act in the dark, was the purpose of the defendants in entering into this arrangement for the interchange of reports as to stocks on hand and past sales and prices. It is probably true that the large manufacturers could take care of themselves if this plan were stricken down. The small manufacturers, however, who constitute the great mass, cannot individually support selling organizations sufficiently extensive to keep in touch with market conditions throughout the country. Only through some such coöperative plan as these reports, therefore, is it possible for them to obtain the information as to market conditions which is so essential to their well-being and that of the industry.

In the *Chicago Board of Trade Case* this court recognized that it was an unhealthy condition where—" Men had to buy and sell without adequate knowledge of actual market conditions,"—and one of the grounds for sustaining the rule there in question was that its purpose was to correct this condition. The condition must be still worse where one side has such knowledge and the other has not.

In the few cases in the lower courts, in which such interchange of reports has been challenged, its legality

has always been sustained until the present case. *United States* v. *Reading Co.*, 183 Fed. 427; 226 U. S. 324; *United States* v. *Piowaty & Sons*, 251 Fed. 375; *United States* v. *Aileen Coal Co.* (District Court, S. D. N. Y., unreported).; *State* v. *Arkansas Lumber Co.*, 260 Mo. 212.

It is not without importance that the practice here in question has become an established feature of American industrial organization, on the strength and advice of counsel that the practice is legal. There is a vital difference between an agreement or association which has for its direct and immediate object the suppression of competition or the raising of prices and one whose direct and immediate object is legitimate but which indirectly might result in higher prices. Thus it is a common thing for producers of an article to associate for the purpose of enlarging the demand for it by advertising or otherwise making known new uses to which it can be put. No one questions the legality of such an association, since its direct and immediate object, namely, enlargement of demand, is legitimate, although expectation of higher prices in consequence of the greater demand was in the thoughts of the parties. *United States* v. *Joint Traffic Association,* 171 U. S. 505, 568; *Hopkins* v. *United States,* 171 U. S. 578, 592, 594, 600; *Anderson* v. *United States,* 171 U. S. 604, 613; *Addyston Pipe & Steel Co.* v. *United States,* 175 U. S. 211, 244. The distinction between the direct and indirect object or effect of an agreement in determining its legality under the Sherman Act was again stated in the *Standard Oil Case,* 221 U. S. 1, 66. In *Swift & Co.* v. *United States,* 196 U. S. 375, after stating that in *United States* v. *Knight Co.,* 156 U. S. 1, " the subject-matter of the combination was manufacture and the direct object monopoly of manufacture within a State," it was added, " However likely monopoly of commerce among the States in the article manufactured was to follow from the agreement it was not a necessary con-

sequence nor a primary end." In *Eastern States Retail Lumber Dealers' Association* v. *United States*, 234 U. S. 600, however, the direct and immediate object in distributing the information was unlawful—a boycott. There is a fundamental difference between merely exchanging information as to past prices and what was done at the "Gary Dinners." *Steel Case*, 223 Fed. 55; 251 U. S. 417. There, the parties by their own admissions reached an understanding as to the prices they would charge in the future.

The stock, production and sales reports, being lawful in themselves, even assuming such a conspiracy as is alleged and that the reports were means of carrying it out, they cannot be prohibited absolutely, as the decree does, but only as such means. Where the means are themselves unlawful acts, they may be enjoined or otherwise prohibited absolutely. *Continental Wall Paper Co.* v. *Voight*, 212 U. S. 227; *Wilder Manufacturing Co.* v. *Corn Products Refining Co.*, 236 U. S. 165, 177. On the other hand, an act, whether single or collective, which is unlawful only because part of an unlawful plan or conspiracy, can be enjoined only in connection with such plan, only as a means of carrying out such conspiracy. *Swift Case*, 196 U. S. 375, 394, 395, 401; *United States* v. *Corn Products Co.*, 234 Fed. 964; *United States* v. *Patten*, 226 U. S. 525; *United States* v. *Pacific & Arctic Ry. & Nav. Co.*, 228 U. S. 87.

Mr. *Solicitor General Beck* and Mr. *James A. Fowler*, Special Assistant to the Attorney General, for the United States.[1]

This case for the first time presents directly for the consideration of this court the practices of those organiza-

---

[1] At the first hearing the case was argued by Mr. *Henry S. Mitchell*, Special Assistant to the Attorney General, on behalf of the United States. Mr. *Solicitor General Frierson* was also on the brief.

tions which are known as " open price associations." The
conditions of the industrial world are such, and the
literature upon the subject so abundant, that the court
will take judicial knowledge that these associations are
so numerous and so extensively organized as to threaten
an economic revolution. The basic principle of these
associations is coöperation, as shown by the language
of writers upon the subject. The object of the Anti-
Trust Act was to preserve competition as defined by
Adam Smith and all political economists since his time;
not " cut-throat competition," but fair and honest com-
petition by the elimination of fraudulent and unfair
practices. But competition was intended to be real and
not fake. The meaning of the words " competition" and
" coöperation " in political economy are directly opposed
to each other. " Competition " in commerce and eco-
nomics is thus defined by Webster: " The effort of two
or more parties, acting independently, to secure the
custom of a third party by the offer of the most favorable
terms "; while " coöperation " is defined as " the associa-
tion of a number of persons for their common benefit;
collective action in the pursuit of common well being,
especially in some industrial or business process."

Members of an association may strive together to attain
results beneficial to all, but such striving would not par-
take of the nature of an effort by each acting independ-
ently to secure the patronage for himself individually of
a third party. The history of the development and the
literature promoting these associations show that their
chief design is to destroy competition and to substitute
therefor coöperation. There are activities in which those
engaged in the same industry may properly act in concert.
For illustration, it would be beneficial to all hardwood
lumber manufacturers for the use of lumber to be extended
into new fields, or for legislation to be passed or treaties
made that would promote the exportation of lumber.

But when men selling in the same market and seeking the same customers join hands in doing the very things that real competitors never have done—things which are directly and fundamentally opposed to every element of competition as defined and understood by all political economists, and as understood by Congress when the Anti-Trust Law was passed, such conduct naturally excites suspicion, and is deserving of the closest scrutiny. The purpose of such conduct is undoubtedly to increase the profits of those acting in concert. In fact, this is not denied by the promoters of the " open price plan," but they say it is accomplished by stabilizing the price, which means that the price will be made more nearly constant at an average price higher than would be the average if the market were not thus stabilized.

It is not possible for real competition to exist under the circumstances proven in this case. If it should once develop, the organization would immediately fall to pieces, because every member of the association who had been undersold would feel that he had been wronged, and thereafter would look upon such a competitor as an enemy. The very existence of the organization depends upon the implied, if not formal, understanding that every member will respect the supposed rights of all the others; that no member will commit an act which will result in injury to any one or all of the other members, but that each will so conduct his business that it will result in the mutual benefit of all. The operation of such a plan is far more efficacious in controlling prices than an actual agreement fixing prices between the same persons. Every party to a price-fixing agreement knows that it is unlawful and incapable of enforcement, and is not only indifferent to its observance but possibly uses it as a means of deceiving his competitor. But under the system here adopted deception is impossible, because if one cuts the price every other member in a few days knows of that

6267°—22——30

fact, and he is conscious of the secret if not the open condemnation of his associates. A distinction is suggested between the members exchanging lists of prices intended to be charged and reporting prices received in actual transactions; but how can an exchange between the members of information as to the prices they intend to charge in the future be more effective than an exchange of exact information as to what they have actually charged in the past? The latter information serves as a much better guide for the future conduct of the membership. Statements as to what one intends to do are unreliable, as they may be, and generally are, deviated from; but an exact record of what one has done is a true index as to what his conduct for the future will be.

The results of the operation of this "open price scheme" are manifestly different when applied to different industries and under different economic conditions. When the product manufactured has but one or a very few grades and the cost of production does not greatly vary, and the capacity of the factories is about equal to the demand, the prices would be on a dead level, and every semblance of competition would disappear, and the trade would be distributed among the producers in almost exact proportion to the capacity of their factories. There would be practically no growth of the smaller factories; and a new factory would hardly dare enter the field. Where the capacities of the factories are much in excess of the demand, under the law of supply and demand prices would materially decrease; and those factories which are operated at the greatest expense would be forced to suspend. But if organized into an "open price association," prices would be maintained at such a point that all members, even the one whose cost of production is greatest, would make some profit. This would be accomplished by either dividing the work between the factories in proportion to their capacities or by dividing

the factories into groups and designating the period of time during which the groups may operate. When the demand for the product manufactured is decreasing and the price is falling, through the influence of an association the reduction of price is greatly impeded, first, by a curtailment of production from a tacit or expressed agreement to that effect and, second, because a member is unwilling to undersell his associates when such fact is known to them. When the demand for the product is increasing and the market is rising, the exchange of information as to mounting prices will produce far more quickly an uneasy market, and greatly increase the excessive prices, as demonstrated by the evidence in this case.

It is argued by appellants that there was no violation of the Anti-Trust Act because it is not shown that the price of lumber was fixed, or was made uniform. Such fact is wholly immaterial, as, if, by agreement, or a concert of action amounting to a tacit agreement, prices were increased, such action was as much a violation of the statute as if it had been agreed that the prices should be uniform at a fixed scale.

To show a violation of the statute it was sufficient to prove concerted action pursuant to an actual or tacit agreement which would naturally and directly curtail the production or increase the price of lumber moving in interstate commerce. That the plan here adopted was sufficiently direct to violate the Anti-Trust Act is shown by *Eastern States Retail Lumber Dealers' Association* v. *United States,* 234 U. S. 600, 608, 612; and that concerted action which is not the result of a formal agreement may violate the law is recognized in *United States* v. *United States Steel Corporation,* 251 U. S. 417, 444, and is positively held in many other cases. The conspiracy and the acts of the conspirators in carrying it out which were condemned in *Loewe* v. *Lawlor,* 208 U. S. 274, and 235

U. S. 522, were more remote from the result than were
the adoption and execution of the plan here proven. In
point of proximity of cause to effect this case is parallel
with the line of cases beginning with *United States* v.
*Jellico Mountain Coal & Coke Co.,* 46 Fed. 432. In
*United States* v. *Reading Co.,* 226 U. S. 324, 348, 351, a
conspiracy was condemned which had never been, and
was not then, effective, and its future effect was uncertain
and speculative. A line of cases beginning with *Hopkins*
v. *United States,* 171 U. S. 578, is relied upon by defend-
ants, in which it was held that the Anti-Trust Act did
not apply because interstate commerce was not directly
involved. Later cases have not so strictly applied the
rule there laid down. See *Swift & Co.* v. *United States,*
196 U. S. 375, 397; *Montague & Co.* v. *Lowry,* 193 U. S. 38.
These cases have no special bearing here, because there
is no question but that the appellants' lumber was moving
in interstate commerce; and if their conduct resulted in
any restraint at all, such restraint was upon interstate
commerce. There is necessarily a distinction between
agreements which by their nature are local in their oper-
ation and but incidentally affect interstate commerce,
and those agreements which directly pertain to such
commerce and are not local in their nature. Where the
agreement necessarily relates to interstate commerce the
courts have never drawn a nice distinction as to whether
or not the effect is immediate or in a measure remote.
Appellants also cite as authority *Anderson* v. *United
States,* 171 U. S. 604, and *Chicago Board of Trade* v.
*United States,* 246 U. S. 231; but neither of those cases
has any material bearing on the questions here presented.
In the former case it was held that the purpose of the
regulations complained of was not to regulate, obstruct
or restrain commerce, but to properly and fairly regulate
the transaction of the business in which the parties to

the agreement were engaged; and in the latter case it was held that under the facts proven the object and effect of the rule of the Board complained of was to promote interstate commerce, and not to restrain it.

Mr. *William J. Matthews* and Mr. *Hugh T. Martin,* by leave of court, filed a brief as *amici curiae.*

MR. JUSTICE CLARKE delivered the opinion of the court.

The unincorporated "American Hardwood Manufacturers' Association" was formed in December, 1918, by the consolidation of two similar associations, from one of which it took over a department of activity designated the " Open Competition Plan," and hereinafter referred to as the " Plan."

Participation in the " Plan " was optional with the members of the Association, but, at the time this suit was commenced, of its 400 members, 365, operating 465 mills, were members of the " Plan." The importance and strength of the Association are shown by the admission in the joint answer that while the defendants operated only five per cent. of the number of mills engaged in hardwood manufacture in the country, they produced one-third of the total production of the United States. The places of business of the corporations and partnerships, members of the " Plan," were located in many States from New York to Texas, but chiefly in the hardwood producing territory of the Southwest. The defendants are the members of the " Plan," their personal representatives, and F. R. Gadd, its " Manager of Statistics."

The bill alleged, in substance, that the " Plan " constituted a combination and conspiracy to restrain interstate commerce in hardwood lumber by restricting competition and maintaining and increasing prices, in violation of the Anti-Trust Act of 1890, c. 647, 26 Stat. 209.

The answer denied that the " Plan " had any such pur-
pose and effect as charged, and averred that it promoted
competition, especially among its own members.

A temporary injunction, granted by the District Court,
restricting the activities of the " Plan " in specified re-
spects, by consent of the parties was made permanent
and a direct appeal brings the case here for review.

The activities which we shall see were comprehended
within the " Open Competition Plan," (which is some-
times called " The New Competition,") have come to be
widely adopted in our country, and, as this is the first time
their legality has been before this court for decision, some
detail of statement with respect to them is necessary.

There is very little dispute as to the facts. The testi-
mony of the Government consists of various documents
and excerpts from others, obtained from the files of the
" Plan," and the testimony of the defendants consists of
like documents and excerpts from other documents, also
from the same files, supplemented by affidavits of a num-
ber of persons, members and non-members, chiefly to the
point that the confessedly great increases of prices during
1919 were due to natural trade and weather conditions
and not to the influence of the " Plan."

The record shows that the " Plan " was evolved by a
committee, which, in recommending its adoption, said:
  " The purpose of this plan is to disseminate among
members accurate knowledge of production and market
conditions so that each member may gauge the market
intelligently instead of guessing at it; to make competi-
tion open and above board instead of secret and con-
cealed; to substitute, in estimating market conditions,
frank and full statements of our competitors for the fre-
quently misleading and colored statements of the buyer."

After stating that the purpose was not to restrict com-
petition or to control prices but to " furnish information
to enable each member to intelligently make prices and to

intelligently govern his production," the committee continues:

" The chief concern of the buyer, as we all know, is to see that the price he pays is no higher than that of his competitors, against whom he must sell his product in the market. The chief concern of the seller is to get as much as anybody else for his lumber; in other words to get what is termed the top of the market for the quality he offers. By making prices known to each other they will gradually tend toward a standard *in harmony with market conditions,* a situation advantageous to both buyer and seller."

Not long after the consolidation, a further explanation of the objects and purposes of the " Plan " was made in an appeal to members to join it, in which it is said:

" The theoretical proposition at the basis of the Open Competition plan is that,

*"Knowledge regarding prices actually made is all that is necessary to keep prices at reasonably stable and normal levels.*

" The Open Competition plan is a central clearing house for information on prices, trade statistics and practices. By keeping all members fully and quickly informed of what the others have done, the work of the plan results in *a certain uniformity of trade practice.* There is no agreement to follow the practice of others, *although members do naturally follow their most intelligent competitors,* if they know what these competitors have been actually doing.

" The monthly meetings held in various sections of the country each month have improved *the human relations* existing between the members before the organization of this plan."

And in another later, and somewhat similar, appeal sent to all the members, this is found:

" Competition, blind, vicious, unreasoning, may stimulate trade to abnormal activity but such condition is no

more sound than that mediæval spirit some still cling to
of taking a club and going out and knocking the other
fellow and taking away his bone.

" The keynote to modern business success is mutual
confidence and co-operation. *Co-operative Competition,
not Cut-throat Competition.* Co-operation is a matter
of business because it pays, because it enables you to get
the best price for your product, because you come into
closer *personal contact with the market.*

" Co-operation will only replace *undesirable competi-
tion* as you develop a co-operative spirit. For the first
time in the history of the industry, the hardwood manu-
facturers are organized into one compact, comprehensive
body, equipped to serve the whole trade in a thorough and
efficient manner. . . . More members mean more
power to do more good for the industry. With co-opera-
tion of this kind we will very soon have enlisted in our
efforts practically every producing interest, *and you know
what that means.*"

Thus, the " Plan " proposed a system of coöperation
among the members, consisting of the interchange of re-
ports of, sales, prices, production and practices, and in
meetings of the members for discussion, for the avowed
purpose of substituting " Co-operative Competition " for
" Cut-throat Competition," of keeping " prices at reason-
ably stable and normal levels," and of improving the
" human relations " among the members. But the pur-
pose to agree upon prices or production was always dis-
claimed.

Coming now to the fully worked out paper plan as
adopted.

It required each member to make six reports to the
Secretary, viz:

1. A *daily* report of all sales actually made, with the
name and address of the purchaser, the kind, grade and
quality of lumber sold and all special agreements of every

kind, verbal or written with respect thereto. "These reports are to be exact copies of orders taken."

2. A *daily* shipping report, with exact copies of the invoices, all special agreements as to terms, grade, etc. The classification shall be the same as with sales.

3. A *monthly* production report, showing the production of the member reporting during the previous month, with the grades and thickness classified as prescribed in the "Plan."

4. A *monthly* stock report by each member, showing the stock on hand on the first day of the month, sold and unsold, green and dry, with the total of each kind, grade and thickness.

5. Price-lists. Members must file at the beginning of each month price-lists showing prices f. o. b. shipping point, which shall be stated. New prices must be filed with the association as soon as made.

6. Inspection reports. These reports are to be made to the association by a service of its own, established for the purpose of checking up grades of the various members and the "Plan" provides for a chief inspector and sufficient assistants to inspect the stocks of all members from time to time.

The declared purpose of the inspection service is not to change any member's grading except with his consent, but to furnish each member a basis on which he can compare his prices with those of other members, thereby making all members' reports more intelligible and accurate.

All of these reports by members are subject to complete audit by representatives of the association. Any member who fails to report *shall not receive the reports* of the secretary, and failure to report for twelve days in six months shall cause the member failing to be dropped from membership.

Plainly it would be very difficult to devise a more minute disclosure of everything connected with one's

business than is here provided for by this "Plan" and very certainly only the most attractive prospect could induce any man to make it to his rivals and competitors.

But, since such voluminous disclosures to the secretary would be valueless unless communicated to the members in a condensed and interpreted form, provision is made for this, as follows:

The secretary is required to send to each member:

1. A *monthly* summary showing the production of each member for the previous month, "subdivided as to grade, kind, thickness," etc.

2. A *weekly* report, not later than Saturday, of all sales, to and including the preceding Tuesday, giving each sale and the price, and the name of the purchaser.

3. On Tuesday of each week the secretary must send to each member a report of each shipment by each member, complete up to the evening of the preceding Thursday.

4. He must send a *monthly* report, showing the individual stock on hand of each member and a summary of all stocks, green and dry, sold and unsold. This report is very aptly referred to by the managing statistician as a monthly inventory of the stock of each member.

5. Not later than the 10th of each month the secretary shall send a summary of the price-lists furnished by members, showing the prices asked by each, and any changes made therein must be immediately transmitted to all the members.

6. A market report letter shall be sent to each member of the association (whether participating in the "Plan" or not) pointing "out changes in conditions both in the producing and consuming sections, giving a comparison of production and sales and in general an analysis of the market conditions."

7. Meetings shall be held once a month at Cincinnati "or at points to be agreed upon by the members." "It is intended that the regular meetings shall afford oppor-

tunity for the discussion of all subjects of interest to the members."

"The 'Plan' also requires the selection of a man to take charge of the gathering and dissemination of data, with necessary assistants," and the defendant F. R. Gadd was selected and given the title of "Manager of Statistics."

This extensive interchange of reports, supplemented as it was by monthly meetings at which an opportunity was afforded for discussion "of all subjects of interest to the members," very certainly constituted an organization through which agreements, actual or implied, could readily be arrived at and maintained, if the members desired to make them.

Such, in outline, was the paper plan adopted by the association, but elaborate though it was, in practice three important additions were made to it.

First of all, the southwestern territory for meeting purposes was divided into four districts, and instead of the monthly meeting provided for in the "Plan," "in order that members could more conveniently attend," the record shows that forty-nine of these meetings were held between January 31, 1919, and February 19, 1920,—approximately one for each week, in some part of the territory.

Second. Before each of these meetings a questionnaire was sent out to the members, and from the replies received, supplementing the other reports, the statistician compiled an estimate of the condition of the market, actual and prospective, which was distributed to the members attending each meeting, and was mailed to those not present. There were eleven questions on this list of which the most important were:

"4th. What was your total production of hardwoods during the last month? What do you estimate your production will probably be for the next two months?"

" 10th. Do you expect to shut down within the next few months on account of shortage of logs or for any other reason? If so, please state how long mill will be idle?' "

" 11th. What is your view of market conditions for the next few months? What is the general outlook for business? State all reasons for your conclusions."

The " Plan " on paper provided only for reports of past transactions and much is made of this in the record and in argument—that reporting to one another past transactions cannot fix prices for the future. But each of these three questions plainly invited an estimate and discussion of future market conditions by each member, and a coördination of them by an expert analyst could readily evolve an attractive basis for coöperative, even if unexpressed, " harmony " with respect to future prices.

Third. The " Plan " provided for a monthly " market report letter " to go to all members of the association. In practice this market report letter was prepared by F. R. Gadd, Manager of Statistics, but his review of the market and forecast for the future were contained, almost from the beginning, not only in these market letters but also in the weekly sales reports, so that they were sent out to all of the members nineteen times between February 1 and December 6, 1919, and they were discussed at all but one or two of the forty-nine meetings which were held. All the activities of the " Plan " plainly culminated in the counsels contained in these letters and reports.

This elaborate plan for the interchange of reports does not simply supply to each member the amount of stock held, the sales made and the prices received, by every other member of the group, thereby furnishing the data for judging the market, on the basis of supply and demand and current prices. It goes much farther. It not only furnishes such information, with respect to stock, sales and prices, but also reports, giving the views of

each member as to "market conditions for the next few months"; what the production of each will be for the next "two months"; frequent analyses of the reports by an expert, with, we shall see, significant suggestions as to both future prices and production; and opportunities for future meetings for the interchange of views, which the record shows were very important. It is plain that the only element lacking in this scheme to make it a familiar type of the competition suppressing organization is a definite agreement as to production and prices. But this is supplied: by the disposition of men "to follow their most intelligent competitors," especially when powerful; by the inherent disposition to make all the money possible, joined with the steady cultivation of the value of "harmony" of action; and by the system of reports, which makes the discovery of price reductions inevitable and immediate. The sanctions of the plan obviously are, financial interest, intimate personal contact, and business honor, all operating under the restraint of exposure of what would be deemed bad faith and of trade punishment by powerful rivals.

The principles of law by which we must judge of the legality of the scheme of doing business thus provided for, as it was worked out in practice, are clearly settled by the Anti-Trust statute and the decisions of this court interpreting it.

The applicable provision of the act (c. 647, 26 Stat. 209) reads:

"Sec. 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is hereby declared to be illegal."

Obviously the organization of the defendants constitutes a combination and confessedly they are engaged in a large way in the transportation and sale of lumber in interstate commerce so that there remains for decision

only the question whether the system of doing business. adopted resulted in that direct and undue restraint of interstate commerce which is condemned by this Anti-Trust statute.

It has been repeatedly held by this court that the purpose of the statute is to maintain free competition in interstate commerce and that any concerted action by any combination of men or corporations to cause, or which in fact does cause, direct and undue restraint of competition in such commerce falls within the condemnation of the act and is unlawful.

In *Northern Securities Co.* v. *United States,* 193 U. S. 197, 337, it is declared that:

" In all the prior cases in this court the Anti-Trust Act has been construed as forbidding any combination which by its necessary operation destroys or restricts free competition among those engaged in interstate commerce; in other words, that to destroy or restrict free competition in interstate commerce was to restrain such commerce."

In *United States* v. *Union Pacific R. R. Co.,* 226 U. S. 61, 87, decided in 1912, long prior to the forming of their combination by the defendants, the law was condensed into this expression:

" To preserve from undue restraint the free action of competition in interstate commerce was the purpose which controlled Congress in enacting this statute, and the courts should construe the law with a view to effecting the object of its enactment."

And in *Eastern States Retail Lumber Dealers' Association* v. *United States,* 234 U. S. 600, 609, it was said:

" It [the Sherman Act] broadly condemns all combinations and conspiracies which restrain the free and natural flow of trade in the channels of interstate commerce."

And again, on p. 613:

" The argument that the course pursued is necessary to the protection of the retail trade and promotive of the

public welfare in providing retail facilities is answered by the fact that Congress, with the right to control the field of interstate commerce, has so legislated as to prevent resort to practices which unduly restrain competition or unduly obstruct the free flow of such commerce, and private choice of means must yield to the national authority thus exerted."

With this rule of law and the details of the " Plan " in mind, we come to consider what the record shows as to the purpose of this combination and as to its effect upon interstate commerce.

We have seen that the " Plan " provided for the selection of a man to have charge of the gathering and dissemination of the data, which were to be contained in the various reports, and that the defendant F. R. Gadd was selected for this purpose, with the title of " Manager of Statistics." Mr. Gadd was a man of large experience in the lumber business, competent and aggressive, and the record makes it clear that he was in complete and responsible charge of all the activities of this " Open Competition Plan." He compiled the summaries of daily, weekly and monthly reports, and wrote the monthly market letter and the market comment in the weekly sales reports, which were distributed to the members. Some disposition appears in the argument, but not in the evidence, to suggest that Gadd exceeded his authority at times, but no objection appears to have been taken to any of his conduct, and the " Secretary-Manager " says in his affidavit that his office adjoins that of Gadd and that " he [Gadd] and the affiant have frequent conferences and discussions relating to their work, and that the affiant is familiar with the activities and methods of the Open Competition Plan."

It is plain that as the " Plan " was the " clearing house " of the members, " for information on prices, trade statistics, and practices," so Gadd was the " clear-

ing house " of the " Plan," and that what he said and did, acquiesced in by the members, as it was, must be accepted as the authoritative expression of the combination.

The record shows that the lumber market was inactive in the months of January and February and the first part of March of 1919. It grew better late in March and progressively stronger until in July, when it became very active, with prices high, and so continued until the end of the year we are considering.

In the first quarter of the year the problem was to maintain the war prices then prevailing rather than to advance them, and although the minutes of the various meetings were kept in barest outline, we find that beginning within a month of the consolidation of the two associations, the members of the " Plan " began actively to coöperate, through the meetings, to suppress competition by restricting production. This is very clearly shown by the excerpts following from the minutes of meetings and from the market letters and sales reports distributed at them.

Thus, at the meeting held at Cincinnati, on January 21, 1919, in the discussion of business conditions, the chairman said:

" If there is *no increase in production,* particularly in oak, there is going to be good business." *"No man is safe in increasing his production.* If he does, he will be in bad shape, as the demand won't come."

Again, at the meeting held on May 9th, at Memphis, in the discussion of market conditions, appears this paragraph:

" Reference was made to members who contemplate running day and night, and it was stated that the lumber industry had seen these unusual market conditions before and that we ought to be very sure that the market is capable of taking care of night and day lumber."

This warning of May 9th against producing too much lumber was followed, on May 17th, by a sales report sent out by the Manager of Statistics to all members, which was headed, "Stop, Look and Listen." After saying that the hardwood market had assumed a decidedly better tone, with a tendency in quotations upward, with the demand on the increase and with stocks below normal, the writer continues:

"The lumbermen have gone through several lean years, but we are confronted with the possibility of killing the goose that laid the golden egg. *Overproduction will spell disaster,* as it should always be borne in mind that the maximum productive capacity of the sawmills of the country is much in excess of any demand the country has ever known."

He then quotes from an editorial in the Southern Lumberman, in which, among other things, it is said:

"*The danger which we see lurking in the future for the lumber industry is overproduction.* When the demand for lumber is keen and the prices are good, it is necessarily a strong temptation to the sawmill men to put on a night shift at the mill and an extra logging crew in the woods, and keep turning out lumber twenty-four hours out of the day. The desire to cash in while the cashing is good is natural and easy to understand; but every sawmill man who contemplates putting on a night shift should stop long enough to reflect on the past history of the lumber business. If he does indulge in such reflection, the chances are he will reconsider any ideas he may have had along that line. *Overproduction* has always been the curse of the lumber industry in America. It has caused more trouble and hardship than any other one factor. It would be criminal folly, therefore, for the lumber manufacturers to indulge themselves in any such form of commercial suicide."

6267°—22——31

Adding that the lumbermen have within their grasp an era of prosperity for some time to come, the writer continues:

" They can either reach forward to seize their opportunity, or *they can cast it aside by the policy of over-* *production.* Which shall it be? It is up to the sawmill men themselves to decide."

The managing statistician of the association significantly adds: *"Are we guilty? If so, the warning is timely."*

Again, a week later, at a meeting at Shreveport, Louisiana, in the discussion of market conditions, one of the members declared: that in his opinion it was *"suicidal to run mills night and day;* that the pine mills had done it, but he hoped they [we] would profit by their past experience and not do it this year."

Much more of like purport appears in the minutes of the meetings throughout the year, but this is sufficient to convincingly show that one of the prime purposes of the meetings, held in every part of the lumber district, and of the various reports, was to induce members to cooperate in restricting production, thereby keeping the supply low and the prices high, and that whenever there was any suggestion of running the mills to an extent which would bring up the supply to a point which might affect prices, the advice against operations which might lead to such result was put in the strongest possible terms. The coöperation is palpable and avowed, its purpose is clear, and we shall see that it was completely realized.

Next, the record shows clearly that the members of the combination were not satisfied to secure, each for himself, the price which might be obtainable even as the result of coöperative restriction of production, but that throughout the year they assiduously cultivated, through the letters of Gadd, speaking for them all, and through the

discussions at the meetings, the general conviction that higher and higher prices were obtainable and a disposition on the part of all to demand them. The intention to create such a common purpose is too clear to be doubted, evidenced as it is by the following excerpts from much of like character in the testimony:

As thus, in the stock report of March 8, 1919, after pointing out that the stock at the mills was only about three-fourths normal and that the production in the Memphis group of manufacturers was only fifty-six per cent. of normal, the letter of the Manager of Statistics continues:

"There has of course been a long drawn out and desperate effort to break the hardwood market by a withdrawal of demand; but be it said to the eternal credit of the hardwood producers that *they have maintained a stout heart and stiff backbone;* with the result that there has been exhibited a strength in the market which has been little short of remarkable in the face of the light demand, and the vigorous efforts which have been steadily made *to hammer down prices.* . . .

"With this information before him it is difficult to see how any intelligent hardwood manufacturer can entertain any hesitation as to *the proper course for him to pursue* in selling his lumber."

And it may be added that it is not difficult to see what this "proper course to pursue" was intended to be.

Again, three weeks later, in the market letter of March 29th, after stating that stocks had further decreased from the previous month, with a production not to exceed fifty per cent. of normal, the Manager of Statistics of the "Plan" adds:

"Naturally the situation ought to have an important bearing on the plans of every hardwood lumberman. If the facts were better understood *offers of business now at shaded prices would get scant consideration* and there

would not only be *no good reason to cut prices,* but there would be every reason why they should be held at reasonable profit-making levels. . . . All conditions indicate a firm market for the balance of the year, with prices moving upward."

Another month later, in the market letter of April 26th, this influential agent of the association, after pointing out that stocks were less than seventy-five per cent. of normal, that production was about sixty per cent. of normal, and that the demand was far in excess of the supply, adds:

"If ever there was a time when rich rewards awaited the producer of hardwood lumber, now is that time. *There are glorious opportunities ahead.* . . . Supply and demand must necessarily govern prices. The demand is with us, the supply inadequate, therefore, *values must increase, as our competition in hardwoods is only among ourselves.*"

Again, in another month, May 24th, in his market letter, the Manager of Statistics, after stating that production during the month of April was sixty-five per cent. of normal and that a careful estimate indicated that there would be no material increase in May and June, says:

"If anyone tells you that lumber prices are coming down, call their attention to the following: *Curtailed production of mills;* stocks at mill points are below normal; . . . *necessity* on the part of lumber operators *of maintaining a price level that will enable them to make a reasonable profit.*"

And he concludes with:

"The tendency of the market is upward and will undoubtedly continue to advance as long as sales and production bear their present relation to each other."

Again on September 20th, in his market letter, he says:

"It has been rumored that a certain class of buyers, believing that the price of lumber was too high and that the

temporary inactivity in the export market offered the opportune moment, have agreed to confine purchases to actual immediate requirements during the next sixty days. This is not going to worry the manufacturers very much; in fact, it will give them a much needed breathing spell and an opportunity to accumulate a supply of dry stocks which, in our opinion, is the same as gold dollars in the bank.

\* \* \* \* \* \* \*

" Those who have been looking for lower prices overlook the very important factors: that production continues below normal . . . that unsold stocks at mills are 70 per cent. below normal; . . . that the export demand has just started, . . ."

And he concludes:

" With these conditions prevailing, there is *nothing in the situation that should encourage anyone to hope for a drop in quotations."*

To this we must add that constantly throughout the minutes of the various meetings there is shown discussion of the stock and production reports in which the shortage of supply was continually emphasized, with the implication, not disguised, that higher prices must result. Men in general are so easily persuaded to do that which will obviously prove profitable that this reiterated opinion from the analyst of their association, with all obtainable data before him, that higher prices were justified and could easily be obtained, must, inevitably have resulted, as it did result, in concert of action in demanding them.

But not only does the record thus show a persistent purpose to encourage members to unite in pressing for higher and higher prices, without regard to cost, but there are many admissions by members, not only that this was the purpose of the " Plan ", but that it was fully realized.

Within four months of the consolidation, on April 23, 1919, the Manager of Statistics wrote to members asking

each to write him "his experience with the Plan" and any incidents showing benefits derived from it.

The replies to this letter are significant confessions. One writes:

"All those who have access to your reports bring their prices to the top."

Another:

"There seems to be a friendly rivalry among members to see who can get the best prices, whereas, under the old plan it was cut throat competition."

Another:

"It has kept us in touch closely with the market and in many instances has made us one or more dollars per thousand feet on lumber that we have sold and we believe that the plan is going to be very successful in carrying out the purposes for which it is intended."

Another:

"The very first report which we received under this plan enabled us to increase our price $6 per thousand on a special item in oak. We had just taken a small order at what we thought was a satisfactory price, but discovered immediately that others were getting more money and since that time we have booked orders for a number of these special items at an increase of $6 per thousand."

Another:

"Since we have become members, we have been selling our lumber at several dollars per M more than formerly and we are perfectly satisfied with the plan."

And another:

*"We have always left these meetings feeling that we did not get enough money for our lumber and that we ought to try to do better."*

There was one discordant reply, saying:

"The Open Competition Plan has been absolutely accurate but instead of apparently stabilizing the market,

it has caused a run-a-way market."—This on May 29th, within six months of the forming of the combination.

These quotations are sufficient to show beyond discussion that the purpose of the organization and especially of the frequent meetings was to bring about a concerted effort to raise prices regardless of cost or merit, and so was unlawful, and that the members were soon entirely satisfied that the " Plan " was " carrying out the purpose for which it was intended."

As to the price conditions during the year. Without going into detail the record shows that the prices of the grades of hardwood in most general use were increased to an unprecedented extent during the year. Thus, the increases in prices of varieties of oak, range from 33.3% to 296% during the year; of gum, 60% to 343%, and of ash, from 55% to 181%. While it is true that 1919 was a year of high and increasing prices generally and that wet weather may have restricted production to some extent, we cannot but agree with the members of the " Plan " themselves, as we have quoted them, and with the District Court in the conclusion that the united action of this large and influential membership of dealers contributed greatly to this extraordinary price increase.

Such close coöperation, between many persons, firms, and corporations controlling a large volume of interstate commerce, as is provided for in this " Plan," is plainly in theory, as it proved to be in fact, inconsistent with that free and unrestricted trade which the statute contemplates shall be maintained; and that the persons conducting the association fully realized this is apparent from their protesting so often as they did, in many of their confidential communications appearing in this record, that their purposes were not unlawful, that they sought only to supplant cut-throat competition with what in their own judgment would be " fair and reasonable competition," and to obtain, not make, fair prices, and by their

repeated insistence that the Sherman Law " designed to prevent the restraint of trade is itself one of the greatest restrainers of trade, and should be repealed.".

To call the activities of the defendants, as they are proved in this record, an " Open Competition Plan " of action is plainly a misleading misnomer.

Genuine competitors do not make daily, weekly and monthly reports of the minutest details of their business to their rivals, as the defendants did; they do not contract, as was done here, to submit their books to the discretionary audit and their stocks to the discretionary inspection of their rivals for the purpose of successfully competing with them; and they do not submit the details of their business to the analysis of an expert, jointly employed, and obtain from him a " harmonized ". estimate of the market as it is and as, in his specially and confidentially informed judgment, it promises to be. This is not the conduct of competitors but is so clearly that of men united in an agreement, express or implied, to act together and pursue a common purpose under a common guide that, if it did not stand confessed a combination to restrict production and increase prices in interstate commerce and as, therefore, a direct restraint upon that commerce, as we have seen that it is, that conclusion must inevitably have been inferred from the facts which were proved. To pronounce such abnormal conduct on the part of 365 natural competitors, controlling one-third of the trade of the country in an article of prime necessity, a " new form of competition " and not an old form of combination in restraint of trade, as it so plainly is, would be for this court to confess itself blinded by words and forms to realities which men in general very plainly see and understand and condemn, as an old evil in a new dress and with a new name.

The " Plan " is, essentially, simply an expansion of the gentlemen's agreement of former days, skilfully devised

to evade the law. To call it open competition because
the meetings were nominally open to the public, or be-
cause some voluminous reports were transmitted to the
Department of Justice, or because no specific agreement
to restrict trade or fix prices is proved, cannot conceal
the fact that the fundamental purpose of the " Plan " was
to procure " harmonious " individual action among a large
number of naturally competing dealers with respect to
the volume of production and prices, without having any
specific agreement with respect to them, and to rely for
maintenance of concerted action in both respects, not
upon fines and forfeitures as in earlier days, but upon
what experience has shown to be the more potent and
dependable restraints, of business honor and social pen-
alties,—cautiously reinforced by many and elaborate re-
ports, which would promptly expose to his associates any
disposition in any member to deviate from the tacit un-
derstanding that all were to act together under the subtle
direction of a single interpreter of their common pur-
poses, as evidenced in the minute reports of what they
had done and in their expressed purposes as to what
they intended to do.

In the presence of this record it is futile to argue that
the purpose of the " Plan " was simply to furnish those
engaged in this industry, with widely scattered units, the
equivalent of such information as is contained in the
newspaper and government publications with respect to
the market for commodities sold on boards of trade or
stock exchanges. One distinguishing and sufficient dif-
ference is that the published reports go to both seller and
buyer, but these reports go to the seller only; and an-
other is that there is no skilled interpreter of the pub-
lished reports, such as we have in this case, to insistently
recommend harmony of action likely to prove profitable
in proportion as it is unitedly pursued.

Convinced, as we are, that the purpose and effect of
the activities of the " Open Competition Plan," here

under discussion, were to restrict competition and thereby restrain interstate commerce in the manufacture and sale of hardwood lumber by concerted action in curtailing production and in increasing prices, we agree with the District Court that it constituted a combination and conspiracy in restraint of interstate commerce within the meaning of the Anti-Trust Act of 1890 (26 Stat. 209) and the decree of that court must be

*Affirmed.*

Mr. Justice Holmes, dissenting.

When there are competing sellers of a class of goods, knowledge of the total stock on hand, of the probable total demand, and of the prices paid, of course will tend to equalize the prices asked. But I should have supposed that the Sherman Act did not set itself against knowledge—did not aim at a transitory cheapness unprofitable to the community as a whole because not corresponding to the actual conditions of the country. I should have thought that the ideal of commerce was an intelligent interchange made with full knowledge of the facts as a basis for a forecast of the future on both sides. A combination to get and distribute such knowledge, notwithstanding its tendency to equalize, not necessarily to raise, prices, is very far from a combination in unreasonable restraint of trade. It is true that it is a combination of sellers only, but the knowledge acquired is not secret, it is public, and the buyers, I think I may assume, are not less active in their efforts to know the facts. A combination in unreasonable restraint of trade imports an attempt to override normal market conditions. An attempt to conform to them seems to me the most reasonable thing in the world. I see nothing in the conduct of the appellants that binds the members even by merely social sanctions to anything that would not be practised, if we could imagine it, by an allwise socialistic government acting for the benefit

of the communty as a whole. The parties to the combination are free to do as they will.

I must add that the decree as it stands seems to me surprising in a country of free speech that affects to regard education and knowledge as desirable. It prohibits the distribution of stock, production, or sales reports, the discussion of prices at association meetings, and the exchange of predictions of high prices. It is true that these acts are the main evidence of the supposed conspiracy, but that to my mind only shows the weakness of the Government's case. I cannot believe that the fact, if it be assumed, that the acts have been done with a sinister purpose, justifies excluding mills in the backwoods from information, in order to enable centralized purchasers to take advantage of their ignorance of the facts.

I agree with the more elaborate discussion of the case by my brother Brandeis.

MR. JUSTICE BRANDEIS dissenting, with whom MR. JUSTICE MCKENNA concurs.

There are more than 9,000 hardwood lumber mills in that part of the United States which lies east of a line extending from Minnesota to Texas. Three hundred and sixty-five concerns—each separate and independent—are members of an association by means of which they coöperate under the so-called "Open Competition Plan." Their mills—about 470 in number—are located in eighteen States. Their aggregate production is about thirty per cent. of the total production of hardwood in the United States. The question presented for our decision is whether the "Open Competition Plan" either inherently or as practiced by these concerns violates the Sherman Law. The Plan provides for coöperation in collecting and distributing information concerning the business of members and generally in regard to the trade. That in adopting the Plan the members formed a combination

in trade is clear. Coöperation implies combination. And this combination confessedly relates to interstate trade. It is also clear that a plan for coöperation, although itself innocent, may be made an instrument by which illegal restraint is practiced. But the decree below should, in my opinion, be reversed, because the Plan is not inherently a restraint of trade, and the record is barren of evidence to support a finding that it has been used, or was intended to be used, as an instrument to restrain trade.

Restraint of trade may be exerted upon rivals; upon buyers or upon sellers; upon employers or upon employed. Restraint may be exerted through force or fraud or agreement. It may be exerted through moral or through legal obligations; through fear or through hope. It may exist although it is not manifested in any overt act, and even though there is no intent to restrain. Words of advice seemingly innocent and perhaps benevolent, may restrain, when uttered under circumstances that make advice equivalent to command. For the essence of restraint is power; and power may arise merely out of position. Wherever a dominant position has been attained, restraint necessarily arises. And when dominance is attained, or is sought, through combination—however good the motives or the manners of those participating—the Sherman Law is violated; provided, of course, that the restraint be what is called unreasonable.

In the case before us there was clearly no coercion. There is no claim that a monopoly was sought or created. There is no claim that a division of territory was planned or secured. There is no claim that uniform prices were established or desired. There is no claim that by agreement, force, or fraud, any producer, dealer or consumer was to be or has in fact been controlled or coerced. The Plan is a voluntary system for collecting from these independent concerns detailed information concerning the business operations of each, and its opinions as to trade

conditions, prospects and policy; and of collating, inter-
preting, and distributing the data so received among the
members of the association and others.   No information
gathered under the Plan was kept secret from any pro-
ducer, any buyer or the public.   Ever since its incep-
tion in 1917, a copy of every report made and of every
market letter published has been filed with the Depart-
ment of Justice, and with the Federal Trade Commission.
The district meetings were open to the public.   Dealers
and consumers were invited to participate in the discus-
sions and to some extent have done so.

It is claimed that the purpose of the " Open Competi-
tion Plan" was to lessen competition.   Competition
among members was contemplated and was in vigorous
operation.   The Sherman Law does not prohibit every
lessening of competition; and it certainly does not com-
mand that competition shall be pursued blindly, that
business rivals shall remain ignorant of trade facts or be
denied aid in weighing their significance.   It is lawful to
regulate competition in some degree.   *Chicago Board of
Trade* v. *United States,* 246 U. S. 231.   But it was neither
the aim of the Plan, nor the practice under it, to regulate
competition in any way.   Its purpose was to make ra-
tional competition possible by supplying data not other-
wise available and without which most of those engaged
in the trade would be unable to trade intelligently.

The hardwood lumber mills are widely scattered.   The
principal area of production is the Southern States.   But
there are mills in Minnesota, New York, New England
and the Middle States.   Most plants are located near the
sources of supply; isolated, remote from the larger cities
and from the principal markets.   No official, or other
public, means have been established for collecting from
these mills and from dealers data as to current produc-
tion, stocks on hand and market prices.   Concerning
grain, cotton, coal and oil, the Government collects and

publishes regularly, at frequent intervals, current information on production, consumption and stocks on hand; and boards of trade furnish freely to the public details of current market prices of those commodities, the volume of sales, and even individual sales, as recorded in daily transactions. Persons interested in such commodities are enabled through this information to deal with one another on an equal footing. The absence of such information in the hardwood lumber trade enables dealers in the large centres more readily to secure advantage over the isolated producer.. And the large concerns, which are able to establish their own bureaus of statistics, secure an advantage over smaller concerns. Surely it is not against the public interest to distribute knowledge of trade facts, however detailed. Nor are the other features of the Plan—the market letters and the regional conferences, an unreasonable interference with freedom in trade. Intelligent conduct of business implies not only knowledge of trade facts, but an understanding of them. To this understanding editorial comment and free discussion by those engaged in the business and by others interested are aids. Opinions expressed may be unsound; predictions may be unfounded; but there is nothing in the Sherman Law which should limit freedom of discussion, even among traders.

It is insisted that there was a purpose to curtail production. No evidence of any such purpose was introduced. There was at no time uniformity in the percentage of production to capacity. On the contrary the evidence is uncontradicted that the high prices induced strenuous efforts to increase production. Weather and labor conditions had made production difficult. Tractors were purchased at great cost to get the logs out of the forests which excessive rains had rendered inaccessible to the usual methods of transport. The current sales of new machinery to hardwood lumber mills were on an unprece-

dented scale. Where equipment and supply of logs permitted, mills were run at night to overcome the restrictions upon production which the bad weather had imposed. There were, it is true, from time to time, warnings in the "Market Letters" and otherwise, against overproduction—warnings which seem not to have been heeded. But surely Congress did not intend by the Sherman Act to prohibit self-restraint—and it was for self-restraint that the only appeal was made. The purpose of the warnings was to induce mill owners to curb their greed—lest both they and others suffer from the crushing evils of overproduction. Such warning or advice whether given by individuals or the representatives of an association presents no element of illegality.

It is urged that this was a concerted effort to enhance prices. There was at no time uniformity in prices. So far as appears every mill charged for its product as much as it could get. There is evidence that the hardwood mills expected, by adopting the Plan, to earn more in profits; and to do so, at least in part, by getting higher prices for their product. It may be that the distribution of the trade data, the editorial comment and the conferences enabled the producers to obtain, on the average, higher prices than would otherwise have been possible. But there is nothing in the Sherman Law to indicate that Congress intended to condemn coöperative action in the exchange of information, merely because prophecy resulting from comment on the data collected may lead, for a period, to higher market prices. Congress assumed that the desire to acquire and to enjoy property is the safest and most promising basis for society. And to that end it sought, among other things, to protect the pursuit of business for private profit. Its purpose, obviously, was not to prevent the making of profits or to counteract the operation of the law of supply and demand. Its purpose was merely to prevent restraint. The illegality of a com-

bination under the Sherman Law lies not in its effect upon the price level, but in the coercion thereby effected. It is the limitation of freedom, by agreements which narrow a market, as in *Addyston Pipe & Steel Co.* v. *United States,* 175 U. S. 211, and *Montague & Co.* v. *Lowry,* 193 U. S. 38, or by organized boycott, as in *Loewe* v. *Lawlor,* 208 U. S. 274, and *Eastern States Retail Lumber Dealers' Association* v. *United States,* 234 U. S. 600, or by the coercive power of rebates, as in *Thomsen* v. *Cayser,* 243 U. S. 66, which constitutes the unlawful restraint.

The coöperation which is incident to this Plan does not suppress competition. On the contrary it tends to promote all in competition which is desirable. By substituting knowledge for ignorance, rumor, guess and suspicion, it tends also to substitute research and reasoning for gambling and piracy, without closing the door to adventure or lessening the value of prophetic wisdom. In making such knowledge available to the smallest concern it creates among producers equality of opportunity. In making it available also to purchasers and the general public, it does all that can actually be done to protect the community from extortion. If, as is alleged, the Plan tends to substitute stability in prices for violent fluctuations, its influence, in this respect, is not against the public interest. The evidence in this case, far from establishing an illegal restraint of trade, presents, in my opinion, an instance of commendable effort by concerns engaged in a chaotic industry to make possible its intelligent conduct under competitive conditions.

The refusal to permit a multitude of small rivals to coöperate, as they have done here, in order to protect themselves and the public from the chaos and havoc wrought in their trade by ignorance, may result in suppressing competition in the hardwood industry. These keen business rivals, who sought through coöperative exchange of trade information to create conditions under which alone ra-

tional competition is possible, produce in the aggregate about one-third of the hardwood lumber of the country. This court held in *United States* v. *United States Steel Corporation,* 251 U. S. 417, that it was not unlawful to vest in a single corporation control of 50 per cent. of the steel industry of the country; and in *United States* v. *United Shoe Machinery Co.,* 247 U. S. 32, the court held that it was not unlawful to vest in a single corporation control of practically the whole shoe machinery industry. May not these hardwood lumber concerns, frustrated in their efforts to rationalize competition, be led to enter the inviting field of consolidation? And if they do, may not another huge trust with highly centralized control over vast resources, natural, manufacturing and financial, become so powerful as to dominate competitors, wholesalers, retailers, consumers, employees and, in large measure, the community?