**TAG MFRS. INSTITUTE et al. v. FEDERAL TRADE COMMISSION.**

No. 4287.

United States Court of Appeals
First Circuit.

May 12, 1949.

Robert E. Canfield, of New York City (William W. Corlett, Francis C. Lowthrop, and Wise, Corlett & Canfield, all of New York City, on the brief), for petitioners.

Walter B. Wooden, Associate Gen. Counsel, and Everette MacIntyre, Asst. Chief Trial Counsel, both of Washington, D. C. (W. T. Kelley, Gen. Counsel, of Washington, D. C., on the brief), for respondent.

Before MAGRUDER, Chief Judge, WOODBURY, Circuit Judge, and PETERS, District Judge.*

MAGRUDER, Chief Judge.

Petitioners in this case ask us, pursuant to the authority of § 5(c) of the Federal Trade Commission Act, as amended, 38 Stat. 719, 52 Stat. 112, 15 U.S.C.A. § 45(c), to review and set aside or modify a cease and desist order of the Federal Trade Commission. The petition contains sufficient allegations of fact to establish this court as a proper forum for review.

On May 2, 1941, the Commission issued its complaint against the present petitioners, the Tag Manufacturers Institute (hereinafter called the Institute), an unincorporated trade association, Frank H. Baxter, trading under the name of Frank H. Baxter Associates, individually and as secretary-treasurer and executive director of the Institute, and twenty-nine corporations and two partnerships each engaged in the business of manufacturing tag products. The complaint alleged that beginning more than three years prior to May 2, 1941, and continuing to that date, petitioners "have entered into and carried out an understanding, agreement, combination, and conspiracy to restrict, restrain, suppress and eliminate price competition in the sale and distribution of said tag products" in interstate commerce; that pursuant to said agreement, petitioners "have fixed and maintained, and still fix and maintain, uniform prices, terms and conditions of sale for said tag products"; that the acts and practices of petitioners "have a dangerous tendency to and have actually hindered and prevented price competition" in the sale of tags in interstate commerce, have placed in

---

* Judge PETERS heard the oral argument and participated in the conference at which a tentative decision for the petitioners was taken. The draft of this opinion was not completed until after the onset of his serious illness. It must therefore be recorded that Judge PETERS does not participate in the judgment of the court.

petitioners the power to control and enhance prices on said products, have unreasonably restrained such commerce "and constitute unfair methods of competition in commerce within the intent and meaning of the Federal Trade Commission Act."

There followed a protracted proceeding before the Commission, with a transcript of testimony of more than 2500 pages and exhibits numbering 1500 more or less. Finally, after a hearing on exceptions to the trial examiner's report, the Commission on May 19, 1947, issued its findings of fact and the cease and desist order now under review.

The manufacturing petitioners sell and distribute approximately 95 per cent of the tag products purchased and used in the United States, with 55 per cent of the business of the industry shared by the four largest manufacturers.

Certain standardized tags are made in advance of sale and sold out of stock, such as plain unprinted stock shipping tags. However, over 80 per cent of the business is in made-to-order tags, the varieties of which are almost unlimited, representing as they do selective combinations of materials and processes, or component elements, in various sizes and shapes. The much greater part of the products of the industry, particularly of made-to-order tags, is sold direct to consumers, but there is a considerable volume of sales to distributors and others for resale. To some extent, tag manufacturers buy from other manufacturers, for resale, types of tags which they do not themselves manufacture. Orders

for tags are generally small in dollar value, averaging between $20 to $40, and a thousand or more orders for tags are placed with manufacturers each business day.

In such an industry, it would evidently not be practicable for a manufacturer to give a price on each order, based upon an individual cost estimate of that order. Hence, early in the history of the industry, manufacturers began to issue price lists to their salesmen, distributors and customers. The simple stock tags were customarily listed at stated prices for the finished product. With respect to the more elaborate, and infinitely various made-to-order tags, the price lists would enumerate the prices of the various basic components, such as tag stock, strings, wires, punches, eyelets, stapling, gumming, printing, etc.—from which the price for any particular tag, made up from the desired combination of components, might be computed.[1]

■ A price list is normally not construed to be a general offer in the sense that a contract would be formed by a communication from an intending buyer stating that he agrees to take a specific quantity of the goods at the listed price; rather, the preferred construction is that the price list is merely an invitation to customers to make offers to buy on the basis of the list prices. 1 Williston on Contracts, Rev. Ed.1936, § 27. The price list does serve to indicate to the trade the scale of prices which the seller hopes and expects to maintain in the generality of future transactions until further notice. If he should later

[1] The following extract from an exhibit indicates the enormous variety of tag products:

"There are eight standard sizes of shipping tags and according to the T.M.I. Manual of Standard Specifications, these are commonly available in forty-nine different grades of stock. There are thirty-six varieties of printing in reasonably common use and any tag can be delivered in any of four forms, namely unstrung, strung, wired or with fasteners attached. Multiplying 8 by 49 by 36 by 4 gives 56,448 possible items based on the eight standard sizes of shipping tags.

"That is, however, only the beginning. Shipping Tags can be furnished in other than standard sizes and in special qualities of stock, nor is the kind of print-

ing necessarily limited to the thirty-six varieties above referred to. There are different qualities of strings and wires which can be attached in many different lengths and there are several styles of tag fasteners used every day of the week. Other special features available on Shipping Tags include serial numbers of which there may be from 1 to more than 100 on each tag, varnishing, paraffining, lacquering, special patches, punches and perforations, and various sizes and qualities of metal eyelet reinforcements.

"Besides shipping tags the industry manufactures merchandise tags in considerable variety, subject, not only to the variations just discussed, but to considerably greater variety in sizes than·is commonly among shipping tags."

wish to take advantage of changed market conditions warranting an increase in the price level, he would naturally put out a revised price list. If, on the other hand, the seller experiences difficulty in maintaining the scale of prices in his extant price list, and is increasingly obliged to make off-list sales at lower prices, the price list will eventually lose its significance and a revised one will be issued to the trade. In other words, from the nature of things it is reasonably to be expected that off-list sales would be the exception rather than the rule, and that the greater portion of sales would be at the prices stated in the seller's current price list. This is particularly true in an industry such as the tag industry, with its wide variety of products and tremendous number of sales transactions each of small dollar volume on the average.

The issuance of price lists by tag manufacturers had become established as a general practice in the industry prior to the formation of the Institute and prior to the execution of the various Tag Industry Agreements, later to be described, which formed the principal basis of the Commission's complaint against petitioners.

The Institute was organized in 1933, and has operated continuously since that time. All the manufacturing petitioners have become members of the Institute. At all times since its organization, the active management of the Institute has been in the hands of petitioner Frank H. Baxter, its secretary-treasurer and executive director. The Institute has concerned itself with typical trade association activities, and among other things has fostered efforts at more refined standardization of tag products and components thereof.

While the National Industrial Recovery Act, 48 Stat. 195, was in effect, a Code of Fair Competition for the Tag Industry was promulgated February 1, 1934. The Code Authority consisted of the Executive Committee of the Institute and such other persons as the Administrator for Industrial Recovery designated. Under the Code, a so-called "open-price plan of selling" was prescribed, under which each member of the industry was required to file a schedule of his prices and terms of sale; manu-

facturers who did not file such a schedule were "deemed to have filed a schedule conforming * * * with the schedule * * * on file which states the lowest price and the most favorable terms." It was provided that no filed schedule "shall be such as to permit the sale of any product at less than the cost thereof" to the filing member, determined in a manner thereinafter prescribed. Further, it was provided that no member of the industry "shall sell such product for less than such price or upon terms or conditions more favorable" than stated in his filed price schedule. A revised schedule might be filed at any time, but such revision was not to become effective until seven days after the date of filing, "provided, however, that an increased price may become effective at such earlier date as the member filing the same shall fix." Petitioners concede that these price-fixing provisions of the Code would have been illegal except for the exemption from the anti-trust laws contained in the National Industrial Recovery Act.

After the National Industrial Recovery Act was invalidated in A.L.A. Schechter Poultry Corp. v. United States, 1935, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947, members of the industry adopted a succession of four Tag Industry Agreements, so-called, in 1935, 1936, 1937 and 1940. The 1940 agreement was in effect when the Commission's complaint was filed, and was still in effect at the time of the final hearing before the Commission. Four of the manufacturing petitioners were not subscribers to the first two agreements, but all of them were parties to the 1937 and 1940 agreements, and all tag manufacturers who were parties to a particular agreement were members of the Institute at the same time. One of the subscribers to the two later agreements, the Whitney Manufacturing Corporation, was not a tag manufacturer but a tag jobber, and hence a customer of tag manufacturers.

Each of the agreements provided that Baxter, in his business style Frank H. Baxter Associates, should undertake the administration of the terms of the agreement. Minimum wage provisions were contained in all four agreements, and industrial home-

work was outlawed by the 1937 and 1940 agreements. Otherwise the agreements were concerned chiefly with the reporting and dissemination of industry statistics. There was some variation in detail in the series of agreements, but these variations need not now be elaborately set forth. It is sufficient for present purposes to set forth with particularity only certain features of the 1940 agreement upon which the controversy chiefly turns.

The 1940 agreement is stated to be between certain manufacturers and distributors of tag products, thereinafter called the "Subscribers", and Frank H. Baxter Associates, thereinafter called the "Associates." The agreement recites the desire of the Subscribers "by voluntary action to foster fair competitive opportunities in the public interest, by gathering and disseminating information regarding the essential factors entering into their commercial transactions, and to preserve and maintain a free and open market for the sale and distribution of their products;" and the willingness of the Associates (Baxter) "to undertake and faithfully perform the duties essential to the effective and impartial administration of this Agreement."

Article I of the 1940 agreement defines the products embraced by the agreement by reference to a list contained in an appendix attached thereto. It further prescribes the monthly sum to be paid by each Subscriber to the Associates (Baxter) as compensation for the services to be rendered thereunder. In addition it is provided that each Subscriber shall at the outset deliver to the Associates (Baxter) a monetary deposit ($500 for the larger companies), to constitute a Revolving Fund out of which the Associates, as trustee, shall pay for the account of any Subscriber damages or assessments due under the terms of the agreement. All the parties "agree that the undertakings embraced by this contract shall at all times constitute the entire agreement between the parties, or any of them, relating to cooperative action in connection with transactions in the products"; that "any cooperative activities by and between the parties, or any of them, which may tend to extend these undertakings * * * shall constitute a breach thereof"; that the determination by a Board of Arbitration that there has been such a breach "shall have the effect of terminating the contract between that party or those parties found to have been in breach hereof and the other parties hereto."

Article II of the 1940 agreement requires the Subscribers to report to the Associates (Baxter) the prices, terms and conditions of each sale or contract to sell any tag products covered by the agreement. Each such report shall be mailed to Baxter "not later than the close of the business day following that on which such sale or contract of sale was made"; and "shall include a full description of the transaction reported, including such specific items as the Associates may from time to time specify as necessary to a complete understanding of the prices, terms and conditions reported." Further, each Subscriber is required, at the effective date of the agreement, to send to Baxter "a complete statement of his published list prices and terms, including his policies, for himself and his agents, regarding quantity differentials, trade classifications and discounts, credit terms, cash discounts, deferred and partial shipments, delivery terms, overruns and underruns, samples, overshipments, free goods, special services, and rebates or concessions of whatever nature; and complete specifications of his products." As often as a Subscriber's published list prices, terms or conditions of sale may be revised, "he shall report such revision to the Associates not later than the close of the business day following publication thereof." It is further provided that the reporting of published list prices and revisions thereof shall as to sales and contracts of sale "consummated on the basis of such published prices, terms and conditions," constitute the reporting of such transactions as required in the earlier portion of Article II. A further important provision of Article II is as follows:

"(5) The provisions of this Section are intended only to set forth the obligations of the Subscribers to report to the Associates all price-information affecting the products and every change in any element

thereof, actually effective prior to such report. Nothing herein shall be construed as a limitation or restriction upon the right of each Subscriber independently to establish such prices, or such terms and conditions of sale, or policies of whatever nature affecting prices or sales, as he may deem expedient. Nothing in any report made to the Associates by any Subscriber hereunder shall be construed as a representation or pledge as to prices, terms, conditions of sale, or policies in current or future transactions."

With reference to the use by Baxter of the foregoing information, it is provided:

"(6) The Associates shall disseminate information received pursuant to Article II hereof, to all Subscribers, in such form and to such extent as the Associates with the advice of the Subscribers may determine. Provided, however, that no price, term or condition of sale shall be publicized by the Associates until the same shall have appeared in a published price list or shall have been embodied in a closed transaction, whether a sale or contract of sale, or option or agreement to purchase.

"All information relating to prices, terms and conditions of sale disseminated to the Subscribers pursuant hereto shall be freely and fully available to public agencies, distributors and consumers of the products, and to any other properly interested persons; and shall be disseminated in the same manner as to Subscribers, to such of them as may apply therefor and arrange for payment of the reasonable cost of such service.

"Each Subscriber agrees that he will notify purchasers from him of the availability of this information."

Article III of the 1940 agreement requires each Subscriber throughout the life of the agreement to mail to Baxter "duplicates of every invoice or other memorandum of shipment or delivery of the products and of all credit memoranda applicable thereto. Such invoices and memoranda shall indicate quantity, grade or quality, price, destination, purchaser and terms of sale, and shall be accompanied by a full statement of all pertinent information covering samples, over-shipments, free goods,

special services, and rebates or concessions of whatever nature." All such duplicates must be mailed "not later than the close of the business day following that on which the originals thereof were mailed to their addressees." It is provided that the Associates (Baxter) "shall compile the information submitted to them pursuant to this Article in such a way as not to disclose the information of any one Subscriber or the names of any purchasers, and shall disseminate the same to all subscribers in tables showing the quantities of products sold and the sales value thereof; at such intervals and in such detail as the Associates, with the advice of the Subscribers, may from time to time determine."

Article IV of the 1940 agreement relates to the enforcement of the aforesaid reporting undertakings. It is recited that a breach of Article II or Article III by any Subscriber "resulting in the inaccurate, incomplete or tardy dissemination of market information which is the essential aim hereof will, it is agreed, cause pecuniary damage to every other Subscriber in proportion to the extent of his interest in the marketing of the products. And whereas the precise amount of actual damage in any given case would not be susceptible of accurate determination," the Subscribers agree to a scale of "liquidated damages" therein specified. Thus, for delay in transmitting a report of any price, term or condition of sale pursuant to Article II, the liquidated damages are stated to be $5 per day for the period of such delay, provided that no assessment of damages shall exceed 10 per cent of the value of the transaction in question. For failure to transmit copies of invoices or memoranda as described in Article III "within ten (10) days after the date of mailing of the original of each such invoice or memorandum," the "liquidated damages" are stated to be an amount equivalent to 10 per cent of the aggregate value of all the Subscriber's transactions proved to be affected by such failure, up to a maximum of $100 applicable to a single day's billing by one Subscriber. For refusal promptly to respond to inquiries by Baxter or to submit books or records to examination as provided in Article IV, the "liquidated damages" are

stated to be $25 for each day of such default, after receipt from Baxter "of formal demand therefor, citing this Section." Liquidated damages in accordance with the foregoing provisions are to be assessed by Baxter, under a prescribed procedure, which includes the right of an accused Subscriber to a decision by a Board of Arbitration by way of appeal from a determination by Baxter. Liquidated damages collected from each Subscriber are to be distributed pro rata among all other Subscribers. The Article ends with the following: "Nothing herein contained shall be construed as requiring, authorizing or permitting the Associates to assess liquidated damages, if and whenever their counsel shall advise against such action on the grounds that such assessment might constitute an unlawful penalty or forfeiture; **or if and whenever** the facts found in any given case do not establish probable actual damages."

The final Article in the 1940 agreement, Article V, provides for termination of the entire agreement "by written agreement of a majority of the parties"; and permits any Subscriber to terminate his obligations thereunder by giving written notice to Baxter not less than 120 days prior to the desired termination date. It is further provided that any manufacturer of tag products "may become a Subscriber to this Agreement at any time by signing the same and making the payments provided in Article I hereof." An appendix contains additional agreements by the Subscribers relating to minimum wages and overtime rates for work in excess of forty hours per week, and forbidding the employment of homeworkers.

In administering the agreement, Baxter developed what the Commission found to be "a very ingenious system of compiling, correlating, and reporting, to each of the respondent members, the price information filed by them with him." The price lists forwarded to Baxter by the various tag manufacturers after they have been issued to salesmen, distributors and customers, are by him assembled, classified and reflected in a loose-leaf volume entitled "Compilation of Prices, Terms and Conditions of Sale in the Tag Industry," supplemented by let-

ter bulletins from time to time. As above indicated, the manufacturers are required to send in to Baxter reports of their sales or contracts of sales made at off-list prices, that is, transactions consummated on terms varying from those specified in the particular manufacturer's filed price list; and these reports of off-list transactions must be mailed to Baxter not later than the close of the business day following that on which the sale was made. Baxter sends out to all Subscribers daily bulletins, or "pink sheets," recording thousands of these off-list transactions each month, showing the name of seller, description of the tag product, quantity, list price, actual price of the particular off-list transaction, and the state where the customer is located, but not disclosing the name of the buyer. In addition, Baxter periodically compiles and sends out statistical information showing aggregate quantities of tag products sold and aggregate sales value thereof, but not disclosing the figures of any individual manufacturer or the names of any purchasers. This information Baxter derives principally from the duplicate invoices which manufacturers are required to forward to him under Article III of the agreement.

Petitioners and the Commission are at odds in characterizing the information correlated by Baxter in the aforesaid loose-leaf volume or Compilation. The Commission found that the prices of each of the subscribing manufacturers as contained in the Compilation "constituted both the current and future prices" of said manufacturers. Petitioners, on the other hand, say that the Compilation "is a book of reference with respect to past market conditions only." This disagreement seems to us to resolve itself into a mere matter of nomenclature; the basic facts are clear. A new price list is reported to Baxter after it has been issued to the particular manufacturer's salesmen and customers. In that sense, it is a report of a past event. After the lapse of a few days, the information will be relayed by Baxter to the other Subscribers so that due correction of the Compilation may be made to conform to the revised price list. But the Tag Industry Agreement specifically recognizes that the

manufacturers. are free to make off-list sales; and in practice all of the subscribing manufacturers have freely done so. Therefore the Commission is inaccurate in its finding that, when a price list is filed with Baxter, the prices so listed become and remain the prices for tag products of the Subscriber so filing until revised by notice to Baxter and the filing with him of a revised price list. Furthermore, a manufacturer making use of the Compilation at any given moment could not even be sure that the prices of a particular competitor listed therein were the prices contained in that competitor's currently effective price list; for the possibility could not be excluded that such competitor within the previous two or three days might have issued to the trade a revised price list, effective at once, which revision had not yet been relayed by Baxter in regular course.

On the other hand, it is obvious that the Compilation in the hands of the Subscribers is more than an object of academic historical interest and is designed for a practical business purpose. Manufacturers do not change their price lists every day. A price list may remain in effect for weeks, often for months, without change. While at any given moment it is possible that the most recently revised price list of one or two manufacturers might not yet have been reflected in the Compilation, there is every assurance that for the most part the Compilation discloses current price list information. Examination of the Compilation, together with the more recent "pink sheets" showing off-list sales, will give a quite accurate picture of the current price structure in the industry. Also, the "pink sheets" for several weeks past and recent revisions of price lists noted in the Compilation may disclose trends indicative of future market conditions. All this is true, even though each Subscriber remains free to change his price list at any time without prior notice, and though the Subscribers have made no commitment inter se, express or implied, to adhere to their published price lists. It is the contention of petitioners that the statistics thus made readily available under the Tag Industry Agreement are quite properly and lawfully disseminated in order that competition may be, not blind, but intelligent and informed.

Reference has previously been made to the NRA Code for the Tag Industry, under which it was unlawful for a tag manufacturer to make sales at prices or on terms more favorable to the buyer than those contained in his price schedule filed with the Code Authority; and under which a revised price schedule containing lower prices could not become effective until seven days after date of filing. The Commission found that the purpose of the Tag Industry Agreements "was to keep in force and effect the open price-reporting plan originally adopted under the National Industrial Recovery Act." We say without hesitation that this crucial finding is a pure assumption, not a rational inference from the evidence. Under the Tag Industry Agreement, a manufacturer may put into effect a new price list without prior notice to Baxter, and, though leaving unchanged his filed price list, he may make off-list sales also without prior notice to Baxter. The commitment is to report such transactions to Baxter after the event. Of course, a written agreement may be a sham to mask an actual understanding of the parties to a different effect. But the evidence of the practice of the parties under the agreement negatives the possibility of an inference that the real agreement of the Subscribers was that they would adhere to their filed list prices. They all made off-list sales, and reported them to Baxter as required by the agreement. Off-list pricing has occurred without discernible territorial pattern, with no apparent correlation between the frequency of off-list sales and the size of the companies, or the types of tag products, or the size of the orders, or the classes of customers. There has been wide variation in the proportion of off-list business of individual manufacturers from week to week. The Commission found, as an over-all average, that approximately 25 per cent of the dollar volume of the aggregate total sales of all the subscribing manufacturers has been at off-list prices. This figure the petitioners have accepted as correct.

The Commission further found as follows:

"A respondent member in filing an off-list or restricted offer with respondent Frank H. Baxter for dissemination by him was in effect serving notice upon the respondent members competing with him that this was an unusual act and limited in nature and that he was not, in general, varying from his filed price list. Only to the extent that a respondent member repeated such off-list sales did such action affect the general price structure. Consequently, the publicity given to off-list sales among respondent members tended to restrain them from cutting prices and to cause them to maintain and adhere to their filed price lists as published in the general-offer price book [i. e., Baxter's "Compilation" above described]. Such publicity also informed all of the respondent members of the price activity of any particular member and placed the respondent members in a position to take retaliatory action if unsatisfactory pricing policies were followed by any particular respondent."

The foregoing is perhaps more in the nature of a priori argument than a finding of fact. In the many years of operation under the various Tag Industry Agreements, there have been untold hundreds of thousands of sales transactions. In the face of the finding that, on the average, 25 per cent of sales have been off list, an off-list sale certainly cannot be characterized as "an unusual act." We have already pointed out that from the nature of a price list, and the purpose it is designed to serve, one would expect that the greater proportion of sales would be at the prices stated in the seller's current price list; and it is certainly not surprising to find that 75 per cent of the sales of the subscribing manufacturers have been at list. Despite the fact that the Tag Industry Agreements have been in effect for a number of years, the Commission has produced no evidence indicating that the percentage of adherence to list prices has been on the increase, or indeed, that there is now a greater adherence to list prices than was the case prior to the promulgation of the NRA Code under which members of the industry were required to adhere to their filed price schedules. Nor is there evidence of "retaliatory action" by any Subscribers to coerce other Subscribers into adherence to list prices. They all engaged in off-list pricing to such an extent that it would be wholly irrational to infer that the essence of their agreement was that they would all adhere to their current price lists on file with Baxter. The Commission argues in its brief that the requirement of disclosure of off-list sales "exposed the manufacturer who reduced his price to the odium of being a 'price cutter' or 'chiseler.'" Petitioners have aptly replied: "Someone has said that an odor which is common to all is offensive to none."

We quote now another important finding by the Commission:

"The effect of the operation of the open price-reporting plan under the agreements and in the manner hereinabove described has resulted in a substantial uniformity of prices for tags and tag products among the respondent members.

"Such uniformity of prices is clearly indicated by examination of the prices, terms, and conditions of sale set out in the general-offer price books issued by the respondent Frank H. Baxter. In addition, a study was made by I. Chance Buchanan, who was called as a witness for the Commission in this proceeding. This witness studied and compared the offers of each of the respondent members for a selected test period and made a comparison of the prices reflected in the compilation set forth in the general-offer price books issued by the respondent Frank H. Baxter showing compilations of prices, terms, and conditions of sale as of May 12, 1939, and as of August 27, 1940. In making this study the witness prepared a series of tabulations showing the results of his investigation. Summarizing the results shown by these tabulations, it appears that at the beginning of the test period, May 12, 1939, the compilation reflected 96.8 percent uniformity and at the end of the period, August 27, 1940, the compilation reflected 97.5 percent uniformity of general-offer filed prices among the respondent members."

When the Commission finds that the operation of the price-reporting plan "has re-

sulted in a substantial uniformity of prices," we take it the Commission is referring to uniformity of prices which buyers have been obliged to pay, though the finding is supported by reference to evidence relating to uniformity of price lists as reflected in the Compilation. In its brief, the Commission attributes to petitioners a "concession of a 75% uniformity in actual sales prices." It is clear that petitioners have made no such concession. They have conceded that approximately 75 per cent of their aggregate total dollar volume of sales has been at the prices in their respective price lists, which is quite a different thing. They have made no concession at all as to the percentage of uniformity of their filed price lists as reflected in the Compilation.

Petitioners make what has impressed us as a strong attack upon the statistical validity of the price list study by the Commission expert Buchanan referred to in the above quotation. The study was selective, and did not purport to embrace all types of tag products. The trial examiner described the tags covered by the study as "a representative variety of tags." Petitioners point out, however, among other objections, that types of tags representing only 13 per cent of total business were given 71.69 per cent weighting in the study, whereas types of tags representing 87 per cent of total business were given 28.31 per cent weighting; that the types of tags thus over-weighted were stock tags, list prices of which are usually substantially uniform when market conditions are stable, whereas the types of tags thus under-weighted were made-to-order tags, the list prices for components of which usually have a greater degree of non-uniformity. Petitioners also point out that the study excluded sales to wholesalers and sales to government agencies, although wholesalers' discounts and discounts to government agencies, as shown on price lists, were characteristically non-uniform. It is also noted that the Buchanan study reflected a percentage of price list uniformity of the selected types of tags on two dates only, May 12, 1939, and August 27, 1940. Even in the case of stock tags, list prices of which are usually substantially uniform when market conditions are not changing, as petitioners concede, there are from time to time unsettled periods during which Subscribers are successively filing revisions of their price lists, which periods may extend over weeks or months, when there must obviously be non-uniformity in the filed list prices. Petitioners' statistical challenge to the conclusions of the Buchanan study are really not answered in the Commission's brief, except with the suggestion that it is "impracticable" for an appellate court to weigh "petitioners' complicated and labored objections without retrying the case."

We think the evidence does warrant a finding that during the life of the Tag Industry Agreements there has from time to time been considerable list price uniformity with respect to types of tags constituting a large portion of the industry's business. Such a finding, in conjunction with the unchallenged finding that on the average 75 per cent of the industry's business is done at list, would warrant the inference that during the years in which the Tag Industry Agreements have been in effect there has been a considerable uniformity of actual selling prices. The evidence does not, however, warrant the Commission's finding that the effect of the operation of the Tag Industry Agreements "has resulted in a substantial uniformity of prices for tags and tag products among the respondent members." In the first place, this implies that the instances of departure from uniformity are insignificant and unsubstantial—which certainly cannot be said. In the second place, there is no evidence that such uniformity as has existed is a result of the operation of the Tag Industry Agreements, for it does not appear whether there has been an increase or decrease of uniformity either in list prices or in actual selling prices since the agreements have been in operation.

The only evidence in the record giving a glimpse of actual competition between manufacturers for the same piece of business is Commission's Exhibit 1022. This exhibit was compiled by a Commission witness from "pink sheets" in Baxter's office covering a period during which the Tag Industry Agreement of 1937 was in effect, which agreement, unlike that of 1940, required the subscribing manufacturers to

report to Baxter their off-list price quotations as well as consummated sales. The exhibit covered a wide variety of tag products with respect to which the "pink sheets" disclosed a complete uniformity of list prices for the tag or its component parts. It showed over 400 instances in which two or more manufacturers quoted off-list prices to the same customer at the same time on the same piece of business. In 95 per cent of all the given instances, there was non-uniformity in the quoted prices. In every one of the instances where more than three manufacturers were bidding for the same order, the customer had a choice of different quoted prices. Counsel for the Commission was embarrassed when petitioners' counsel proceeded to point out to the trial examiner what the exhibit showed, and sought unsuccessfully to withdraw the exhibit from evidence on the ground that it had been introduced for another purpose. Thus, the only evidence in the record showing actual "shopping around" by tag buyers before placing an order indicated that in 95 per cent of the instances there was competition among the rival manufacturers on the basis of price differentials. Not a single buyer was called by the Commission as a witness to testify that he tried shopping around on a price basis among two or more manufacturers and was met by uniformity of price quotations. Under the circumstances it is not reasonable to assume that the competitive picture etched by Commission's Exhibit 1022 is a distorted one.

In support of its conclusion, the Commission refers to the provisions in the Tag Industry Agreements designed to insure compliance with the reporting commitments of the Subscribers. Baxter was given access to the books and records of the Subscribers in the investigation of complaints of violations and in routine periodic checkups. The Commission found that Baxter "caused periodic checks to be made of the books and records of the various respondent members by a representative of his office to determine if they were adhering to the published prices and reporting all deviations therefrom." As phrased, this finding contains an ambiguous overtone which seems to imply that there was an agreement to adhere to list prices, and

that Baxter examined the books to see if this agreement was being fulfilled. As previously indicated, there was no such agreement. The evidence is uncontradicted that Baxter's only concern with off-list transactions was to find out if they had been reported, after the event, as the agreement required. If the investigation indicated a violation of any reporting obligation of a Subscriber, Baxter would institute proceedings for assessment of "liquidated damages" as specified in the agreement. Total assessments for acts of non-compliance amounted to less than $10,000 for the period 1935–1941. The record contains not a single instance of an assessment for failure to adhere to a list price.

The provisions of the Tag Industry Agreement of 1940, above quoted, are carefully drawn on the theory that these assessments are in the nature of "liquidated damages," which are not to be imposed in the absence of a finding of "probable actual damages." Cf. Sun Printing and Publishing Assn. v. Moore, 1902, 183 U.S. 642, 22 S. Ct. 240, 46 L.Ed. 366. In fact there is evidence in the record of instances where the Board vacated assessments on the ground of lack of probable actual damages. The Commission consistently describes these assessments as "penalties." Whether they are "liquidated damages," as they purport to be, or "penalties," as the Commission calls them, is hardly decisive. If the reporting commitments they are designed to buttress are otherwise lawful, the agreement does not become a violation of the anti-trust laws or the Federal Trade Commission Act merely because the reporting plan is accompanied by a penalty provision which would not be legally enforceable.

Nor is the conclusion of the Commission strengthened by its finding that the administration of the reporting agreements "was materially assisted by the standardization of the component parts of tags and tag products developed and adopted under the auspices of the respondent Institute." As a matter of fact the foundation work in the direction of standardization was done many years before the Institute was organized. A simplified practice recommendation for paper shipping tags was developed by a general conference of producers, dis-

tributors and users of such tags under the auspices and with the active assistance of the Division of Simplified Practice, National Bureau of Standards, and was promulgated by the United States Department of Commerce. A revision was approved in 1939, and has been generally accepted by a large number of producers, distributors and users, and by various agencies of the government, including the Federal Trade Commission. These standardizations are deemed to be to the advantage of all concerned, including the consumer who, among other benefits, is thereby better enabled to know what he is buying and to make intelligent price comparisons. Of course, the detailed standardization of tags and components which the Institute has assisted in developing tends to make more serviceable the information reported to Baxter under the Tag Industry Agreement and by him collated and disseminated among the Subscribers. But if the reporting agreement is otherwise lawful, such enhanced usefulness of the agreement as results from standardization would hardly infect it with illegality. See Maple Flooring Manufacturers Assn. v. United States, 1925, 268 U.S. 563, 566, 45 S.Ct. 578, 69 L.Ed. 1093.

There has been some tendency to look askance at reporting agreements between competitors, where the information exchanged is reserved exclusively to themselves and withheld from buyers or the public generally. Presumably this is because such secrecy more readily suggests the inference that the agreement is inspired by some unlawful purpose and precludes the argument that the information thus secretly exchanged serves a function similar to that of market information made available through the activities of commodity exchanges, trade journals, etc. See American Column & Lumber Co. v. United States, 1921, 257 U.S. 377, 411, 42 S.Ct. 114, 66 L.Ed. 284, 21 A.L.R. 1093; Sugar Institute, Inc., v. United States, 1936, 297 U.S. 553, 596–597, 56 S.Ct. 629, 80 L.Ed. 859; with which cf. Maple Flooring Manufacturers Ass'n v. United States, supra, 268 U.S. at pages 573–574, 45 S.Ct. 578, 69 L.Ed. 1093. The Commission has therefore been at pains to discredit the provision of the Tag Industry Agreements which pur-

ports to render the information compiled by Baxter freely available to any interested person. It found that in practice "the respondent members gave only lip service to this provision and never adopted any practical plan whereby this information might be made available to buyers generally." As above stated, one of the Subscribers to the agreements was the Whitney Manufacturing Corporation, a tag jobber and a buyer from tag manufacturers. The 1940 agreement provided that the information "shall be freely and fully available to public agencies, distributors and consumers of the products, and to any other properly interested persons." It was further provided that the information should be disseminated, in the same manner as to Subscribers, to any persons who might apply therefor and arrange for paying the reasonable cost of the service. Subscribers agreed that they would notify their customers of the availability of this information. Under the 1937 agreement, copies of the Compilation were made available for general inspection at the various regional offices of Dun & Bradstreet. In 1940 this practice was discontinued and instead the subscribing manufacturers thereafter printed a statement on their respective invoices reading as follows: "In common with most tag manufacturers, we file up-to-date records of tag prices with Frank H. Baxter Associates, 370 Lexington Ave., New York City, where they are open for inspection." Baxter kept a Compilation available in his office at New York City for examination by any interested party. However, the Commission found: "While the record indicates that this compilation may have been occasionally examined by purchasers, this plan served no useful purposes for purchasers and consumers located outside the New York area and could not be considered as making this price information available to buyers generally."

We are clearly of opinion that if the reporting agreement is otherwise unobjectionable, it cannot be said to have become illegal for failure of the Subscribers to make the information generally available. Customers are notified on each invoice that "up-to-date records of tag prices" are open for inspection at Baxter's New York

office. If a customer living outside New York City has any curiosity in the matter, he can use the mails; and there is no reason to assume that Baxter would not furnish him the information requested. Nor is there any reason to assume that Baxter would not inform the inquiring customer of his right under the Tag Industry Agreement to subscribe to the service regularly. It is noteworthy that the Commission has failed to produce a single tag buyer to testify that he was unaware of the existence of this information service, or that he sought information from Baxter and could not get it, or that he sought to subscribe to the service and was refused. See United States v. United States Steel Corp., 1920, 251 U.S. 417, 448, 40 S.Ct. 293, 64 L.Ed. 343, 8 A.L.R. 1121. We agree with petitioners that availability "does not mean that the information must be crammed down the throats of buyers who are not interested in seeing it." None of the cases has gone that far.

We have come to the conclusion that the reporting agreements herein, and the practices of petitioners thereunder, are lawful under the controlling authorities. In the sense indicated earlier in this opinion, the issuance of a price list may be said to be an "announcement of future prices." The nature of price lists has not changed under the Tag Industry Agreements from what it has historically been in the industry. The price list is subject to change without notice, and may be freely revised at any time. Even while a particular price list is extant, the manufacturer is free to make sales at off-list prices. This has always been so (except under the NRA Code), and still remains so under the Tag Industry Agreement. When a new price list is issued, the agreement requires the manufacturer, after the event, to report such revised price list to Baxter. In effect the manufacturer thus says to Baxter: "Enclosed is a copy of the new price list which I put in effect yesterday by issuance to my salesmen, distributors and customers." Once a price list has been issued to the trade it necessarily becomes pretty much public property. There is certainly nothing secret about it. It would be no great feat for a manufacturer to obtain copies of his competitors' price lists. The Tag Industry Agreement merely facilitates the assembling of such data. As to the obligation of Subscribers to report off-list sales and to furnish copies of all invoices, that is no more than the reporting of past transactions. The Commission has endeavored to show that the agreement was something more than this, that it was a price-fixing agreement having the purpose and actual effect of restraining and preventing price competition. We believe that such findings are unsupported by the evidence or by any reasonable inferences to be drawn therefrom. We say this with full recognition of our limited scope of review of findings of fact by the Commission. Federal Trade Commission v. Algoma Lumber Co., 1934, 291 U.S. 67, 73, 54 S.Ct. 315, 78 L.Ed. 655.

The Commission's reliance upon American Column & Lumber Co. v. United States, 1921, 257 U.S. 377, 42 S.Ct. 114, 66 L.Ed. 284, 21 A.L.R. 1093, and United States v. American Linseed Oil Co., 1923, 262 U.S. 371, 43 S.Ct. 607, 67 L.Ed. 1035, is misplaced. Neither of these cases suggests that it is per se unlawful for competitors to agree to an exchange of trade data through reports to a central agency. In Maple Flooring Manufacturers Ass'n v. United States, 1925, 268 U.S. 563, 580, 45 S.Ct. 578, 584, 69 L.Ed. 1093, the Court explains that its opinion in the American Column & Lumber Co. case "rests squarely on the ground that there was a combination on the part of the members to secure concerted action in curtailment of production and increase of price, which actually resulted in a restraint of commerce, producing increase of price." At a later point in the Maple Flooring case, 268 U.S. at page 585, 45 S.Ct. at page 585, 69 L.Ed. 1093, the Court in referring collectively to the American Column & Lumber Co. and American Linseed Oil Co. cases, said: "The unlawfulness of the combination arose, not from the fact that the defendants had effected a combination to gather and disseminate information, but from the fact that the court inferred from the peculiar circumstances of each case that concerted action had resulted or would necessarily result in tending arbitrarily to lessen production or increase prices." The Court de-

cided in the Maple Flooring case, 268 U.S. at page 586, 45 S.Ct. at page 586, 69 L.Ed. 1093, that trade associations "which openly and fairly gather and disseminate information as to the cost of their product, the volume of production, the actual price which the product has brought in past transactions, stocks of merchandise on hand, approximate cost of transportation from the principal point of shipment to the points of consumption as did these defendants and who, as they did, meet and discuss such information and statistics without however reaching or attempting to reach any agreement or any concerted action with respect to prices or production or restraining competition, do not thereby engage in unlawful restraint of commerce." We think the following observations of the Court in that case are also relevant to the case at bar, 268 U.S. 582-583, 45 S.Ct. at page 584, 69 L.Ed. 1093:

"It is not, we think, open to question that the dissemination of pertinent information concerning any trade or business tends to stabilize that trade or business and to produce uniformity of price and trade practice. Exchange of price quotations of market commodities tends to produce uniformity of prices in the markets of the world. Knowledge of the supplies of available merchandise tends to prevent overproduction and to avoid the economic disturbances produced by business crises resulting from over-production. But the natural effect of the acquisition of wider and more scientific knowledge of business conditions, on the minds of the individuals engaged in commerce and its consequent effect in stabilizing production and price, can hardly be deemed a restraint of commerce or, if so, it cannot, we think, be said to be an unreasonable restraint, *or in any respect unlawful.* [Italics added.]

"It is the consensus of opinion of economists and of many of the most important agencies of government that the public interest is served by the gathering and dissemination, in the widest possible manner, of information with respect to the produc-

tion and distribution, cost and prices in actual sales, of market commodities because the making available of such information tends to stabilize trade and industry, to produce fairer price levels and to avoid the waste which inevitably attends the unintelligent conduct of economic enterprise. 'Free competition' means a free and open market among both buyers and sellers for the sale and distribution of commodities. Competition does not become less free merely because the conduct of commercial operations becomes more intelligent through the free distribution of knowledge of all the essential factors entering into the commercial transaction. General knowledge that there is an accumulation of surplus of any market commodity would undoubtedly tend to diminish production, but the dissemination of that information cannot in itself be said to be restraint upon commerce in any legal sense. The manufacturer is free to produce, but prudence and business foresight based on that knowledge influence free choice in favor of more limited production. Restraint upon free competition begins when improper use is made of that information through any concerted action which operates to restrain the freedom of action of those who buy and sell." [2]

In Cement Manufacturers Protective Ass'n v. United States, 1925, 268 U.S. 588, 606, 45 S.Ct. 586, 592, 69 L.Ed. 1104, the Court said:

"We realize also that uniformity of price may be the result of agreement or understanding, and that an artificial price level not related to the supply and demand of a given commodity may be evidence from which such agreement or understanding or some concerted action of sellers operating to restrain commerce may be inferred. But here the government does not rely upon agreement or understanding, and this record wholly fails to establish, either directly or by inference, any concerted action other than that involved in the gathering and dissemination of pertinent information with respect to the sale and distribution of cement to which we have referred, and

---

[2] Mr. Justice Brandeis, who knew something about these matters, expressed similar views in his dissenting opinion in American Column & Lumber Co. v. United States, 1921, 257 U.S. 377, 413 et seq., 42 S.Ct. 114, 66 L.Ed. 284, 21 A.L. R. 1093.

it fails to show any effect on price and production except such as would naturally flow from the dissemination of that information in the trade and its natural influence on individual action."

Upon the authority of the Maple Flooring case, the Court held that "such activities are not in themselves unlawful restraints upon commerce and are not prohibited by the Sherman Act [15 U.S.C.A. § 1 et seq.]."

In Sugar Institute, Inc., v. United States, 1936, 297 U.S. 553, 582, 56 S.Ct. 629, 80 L.Ed. 859, the Court struck down an agreement which included a reporting feature with "a requirement of adherence, without deviation, to the prices and terms publicly announced." See also, 297 U.S. at pages 577-9, 585, 601, 56 S.Ct. at page 635, 80 L.Ed. 859. Explaining the holdings in American Column & Lumber and the Linseed Oil cases, supra, the Court said, 297 U.S. at pages 599-600, 56 S.Ct. at page 642, 80 L.Ed. 859: "And, while the collection and dissemination of trade statistics are in themselves permissible and may be a useful adjunct of fair commerce, a combination to gather and supply information as a part of a plan to impose unwarrantable restrictions, as, for example, to curtail production and raise prices, has been condemned." Chief Justice Hughes, speaking for a unanimous Court, also had this to say, 297 U.S. at page 598, 56 S.Ct. at page 642, 80 L.Ed. 859:

"Further, the dissemination of information is normally an aid to commerce. As free competition means a free and open market among both buyers and sellers, competition does not become less free merely because of the distribution of knowledge of the essential factors entering into commercial transactions. The natural effect of the acquisition of the wider and more scientific knowledge of business conditions on the minds of those engaged in commerce, and the consequent stabilizing of production and price, cannot be said to be an unreasonable restraint *or in any respect unlawful.*" [Italics added.]

Obviously the Sugar Institute case is distinguishable from the case at bar for here, as we have seen, the parties have made no agreement to adhere to their filed list prices and, in fact, have departed therefrom whenever they saw fit. The distinction is sharply defined by a further extract from the Sugar Institute case, 297 U.S. at page 601, 56 S.Ct. at page 643, 80 L.Ed. 859:

"The vice in that agreement was not in the mere open announcement of prices and terms in accordance with the custom of the trade. That practice which had grown out of the special character of the industry did not restrain competition. The trial court did not hold that practice to be illegal and we see no reason for condemning it. The unreasonable restraints which the defendants imposed lay not in advance announcements, but in the steps taken to secure adherence, without deviation, to prices and terms thus announced. It was that concerted undertaking which cut off opportunities for variation in the course of competition however fair and appropriate they might be."

It is true that the above cases all came up under the Sherman Act, 15 U.S.C.A. § 1 et seq., rather than under the Federal Trade Commission Act. In Federal Trade Commission v. Cement Institute, 1948, 333 U.S. 683, 694, 708, 68 S.Ct. 793, 92 L.Ed. 1009, it was pointed out that whereas all conduct condemned by the Sherman Act may likewise be an "unfair method of competition" in violation of the Federal Trade Commission Act, the converse is not necessarily true; that individual or concerted conduct which falls short of being a Sherman Act violation may nevertheless constitute an unfair method of competition under the Federal Trade Commission Act. But in the case at bar the gravamen of the Commission's case against petitioners was that the agreement was more than a plan for the exchange of information as to past transactions, and was in fact a price-fixing scheme which in purpose and effect unduly restrained and suppressed competition. The Commission has not held, and would not be warranted in holding, that in the absence of these assumed features of Sherman Act violations (which we think are not supported by the evidence), the reporting agreement as such is nevertheless an "unfair method of competition" within the meaning of the Federal Trade Commission Act.

Since, in our view of the case, the cease and desist order will have to be set aside, it becomes unnecessary for us to consider certain seriously pressed objections by petitioners to the breadth of the order.

A judgment will be entered setting aside the order of the Commission.