**ADVERTISING SPECIALTY NATION-AL ASSOCIATION et al.,**
Petitioners,

v.

**FEDERAL TRADE COMMISSION,**
Respondent.

No. 4982.

United States Court of Appeals First Circuit.

Nov. 5, 1956.

George P. Lamb, Washington, D. C., Sumner S. Kittelle, New York City, Frazer F. Hilder, Washington, D. C., Stephen H. Beach and Cann, Lamb, Long & Kittelle, New York City, on the brief, for petitioners.

J. B. Truly, Atty., Federal Trade Commission, Washington, D. C., Earl W. Kintner, Gen. Counsel, Robert B. Dawkins, Asst. Gen. Counsel, and Robert L. Wald, Atty., Federal Trade Commission, Washington, D. C., on the brief, for respondent.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

Petitioners in this case ask us, pursuant to the authority of § 5(c) of the Federal Trade Commission Act, as amended, 38 Stat. 719, 52 Stat. 112, 15 U.S.C.A. § 45(c), to review and set aside a cease and desist order of the Federal Trade Commission. The petition contains sufficient allegations of fact to establish the jurisdiction of this court on review.

On February 7, 1952, the Commission issued its complaint in this case charging Advertising Specialty National Association (hereinafter termed the Association), its member manufacturers and jobbers and its individual officers, with conspiracy to restrain competition in the sale of advertising specialties through adoption and use of unfair methods of competition in violation of § 5(a) of the Federal Trade Commission Act, as amended 66 Stat. 632, 15 U.S.C.A. § 45 (a). The complaint named the Association and 23 manufacturers, 9 jobbers, and 11 Association officials in their individual capacities and as representatives of all of the members of the Association and their agents.

The complaint alleged the formulation and execution, pursuant to conspiracy, of a variety of practices alleged to be in restraint of trade. These included the establishment and resale maintenance of manufacturers' list prices; the requirement that manufacturers sell to jobbers on a list price basis [1] only; the adoption of uniform practices as to salesmen's compensation, anticipatory discount schedules, free goods, sample charges, and C. O. D. shipments; the prevention of sales from member manufacturers to jobbers not members of the Association; and the arbitrary restriction of jobber membership in the Association. The practices relating to the alleged conspiracy to fix prices in the resale of advertising specialties by jobbers are the only allegations of the complaint which are now pertinent.

The alleged conspiracy embraces that segment of the advertising specialty industry comprising the Association and its member concerns. The industry is conceded to be an unusual one. The functional utility of the hundreds of products which it manufactures and sells is secondary to an overriding common purpose—good-will advertising. The products include calendars, pencils, thermom-

---

1. List price selling from manufacturers to jobbers consists of sales in which the price to be charged to the ultimate consumer is specified (this is the "list price") and the actual cost to each jobber is this list price less a percentage mark-down to reflect the jobber's profit. Under this system the same list price is used in all sales from manufacturers directly to ultimate consumers (without any mark-down, of course) and is the only price appearing on manufacturers' price lists.

Such list price selling is to be distinguished from net price selling, mentioned below, which consists of sales from manufacturers to jobbers at a price which makes no reference to the price to be charged by each jobber to the ultimate consumer. To this "net price" the jobber adds a mark-up for his profit margin. Price competition exists under this system, theoretically, at least, because mark-ups by different jobbers on the same item will presumably differ depending on each jobber's estimate of market conditions and what he regards as a satisfactory profit margin.

eters, leather products, yardsticks, paint paddles, cigarette lighters, knives, letter openers, combs, key cases, notebooks, desk sets, refrigerator dishes, windshield scrapers, and many others. The ultimate purchasers are not the ultimate users. Instead, advertising specialty products are bought by the purchasers for gift presentations. They are imprinted with advertising material specified by the purchaser, usually bearing his name and often a message of expected high persuasive content. The specialty is then presented without charge by the buyer to his donee.

Advertising specialties, generically, are designed to constitute a distinct medium of advertising much as radio or the press. The industry views itself basically as a service rather than a sales industry. Products of different manufacturers for the most part are not comparable, varying as to shape, appearance and value, and there is little price competition among these products. Competition at the manufacturer level is largely in ideas, though at the jobber level there is the possibility of price competition with respect to the products of the same manufacturer resold and distributed through multiple outlets.

The industry is comprised of direct selling manufacturers who merchandise through their own sales force to the ultimate purchaser, manufacturers who sell to jobbers, and manufacturers who market their products both through their own sales force and to jobbers. Jobbers are themselves a unique class in the distribution field. The jobber does not ordinarily maintain an inventory or physically handle his stock, although he carries sample stock. When he secures an order it is transmitted to the manufacturer, imprinted with the advertiser-purchaser's name and shipped by the manufacturer directly to the buyer under the jobber's label. Except for the absence of a physical transfer of the goods to the jobber, however, the relationship between the manufacturer and jobber is essentially the same as that between any supplier and his distributor. In fact, the jobber functions as much like a retailer as a jobber (since his sale is not for further *resale* as is the usual jobber's); but the precise functional classification is not critical to this action, and traditionally these distributors have been denoted as jobbers.

The advertising specialty industry has displayed dynamic growth, and there is frequent entry of new members into the industry. During the depression, total annual sales for the entire industry were approximately $16,000,000. In 1947, estimated sales were $125,000,000–$150,000,000. By 1951 this figure had grown to $300,000,000. Members of the Association accounted for roughly 40 per cent of the latter figure, and included in the Association were most of the so-called prestige manufacturers and jobbers in the industry, among them the four or five largest.

The Association provides a forum for discussion of industry problems, separately among the functional groups and jointly among all members. It also provides a medium for expressing the composite views and aspirations of the member firms.

A Manufacturers Manual of Industry Practices sets forth for the guidance of manufacturers supplying jobbers the majority concept of sound trade practices, and an analogous Jobbers Manual of Practices similarly incorporates the majority jobber view of sound jobber practices.

Association meetings are held semiannually—in the spring and fall—and a Specialty Fair is held each fall. The jobbers group and the manufacturers group are accustomed to meet separately and repeatedly during these gatherings. Joint meetings of the two groups are held in addition to the group meetings. Problems of mutual interest and concern are entered on an agenda and discussed at length at such meetings.

The consensus of jobber opinion with regard to manufacturer relations has been periodically incorporated in jobber recommendations submitted to the manufacturers, who would proceed to consid-

er these recommendations. The entire proceedings of the group meetings have been recorded in minutes compiled by the secretary of the Association, and the jobber recommendations and manufacturer action thereon have been similarly recorded.

The jobber and manufacturer manuals, containing provisions for annual supplements, have been largely a patchwork compendium of points of discussion, recommendations, and group action abstracted from the minutes and allied papers of Association meetings.

After extended hearings, the hearing examiner, on October 8, 1953, entered his initial decision and order dismissing the complaint as to all respondents. He held that none of the charges in the complaint had been sustained and that although an "inference of agreement could reasonably be drawn" from portions of the record, the evidence of agreement was "inconclusive". He also stated that "There is no question of credibility presented." [2] In connection with the price fixing charges, the examiner rested his decision largely on his finding that there was no agreement among manufacturers to fix prices themselves, or to require jobbers to maintain resale prices. The examiner concluded that "what maintenance existed was an individual matter with each Manufacturer down his distributional line rather than a horizontal agreement among manufacturers, as is charged."

The Commission sustained the hearing examiner's dismissal as to 15 of the 18 specific practices charged in the complaint, but reversed without dissent his findings as to the three remaining charges, all relating to establishment and maintenance of list prices. These were framed in the complaint (Paragraph Eight) as follows:

"(9) Respondents further acted in formulating, and carrying out their aforesaid agreements to restrict and restrain competition in that they: * * *

"(b) Have required respondent member manufacturers to sell 'advertising specialties' to respondent member jobbers on a list price basis only. * * *

"(e) Have required respondent member jobbers to resell their products to the ultimate consumer at prices fixed or established therefor by respondent member manufacturers. * * *

"(*l*) Have required those respondent member manufacturers who sell directly through their own salesmen, as well as to jobbers, to maintain the same list prices for their products on their direct sales as are furnished to respondent member jobbers. * * * "

In disapproving the decision of the hearing examiner, the Commission found that he had limited his findings to the issue of possible unlawful agreement among manufacturers, saying:

"There is no charge of price fixing between the respondent manufacturers. The price competition with which this proceeding is concerned is between jobbers selling the products of the same manufacturer. As each of the manufacturers who supply jobbers sells its products to many different competing jobbers, there is competition between the jobbers in the sale of the identical product made by the same manufacturer. Price cutting by one jobber on such merchandise directly affects other jobbers competing in the sale of the same products."

The Commission went on to hold that the record supported a finding that the jobbers acted in concert through the Association and with the manufacturers to secure resale price maintenance for the

2. On the basis of this statement we are entitled to minimize the weight of the hearing examiner's findings in accordance with the Supreme Court's directive in Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 496, 71 S.Ct. 456, 95 L.Ed. 456.

purpose and with the effect of eliminating price competition at the jobber level, and specifically found, to establish jurisdiction over respondents not served in the proceeding, that all members of the Association were represented by counsel and that the named respondents were in fact representative of the membership of the Association as a class. The order to cease and desist was entered against and served upon the Association, the named respondents, and all other jobbers and manufacturers supplying jobbers listed in the Association's 1952 membership roster. The Commission's order, issued March 4, 1955, banned:

> "any planned common course of action, understanding, agreement, combination or conspiracy between or among any two or more of said jobber respondents or between or among any one or more of said jobber respondents and other jobbers not parties hereto, to do or perform any of the following acts or practices:
>
> "(a) Demanding that a manufacturer of said products establish or maintain resale list prices for any of its said products.
>
> "(b) Threatening to boycott a manufacturer of said products which does not establish or maintain list prices for any of its said products. .
>
> "(c) Reporting price cutting of a manufacturer's list prices established as a result of demands or threats of a group of jobbers.
>
> "(d) Eliminating, lessening or suppressing price competition between or with jobbers of any manufacturer's said products."

It further ordered the respondent manufacturers supplying jobbers, the Association, and its officers, to cease and desist from "Participating in, cooperating with, assisting in, or carrying out" any such conspiracy of jobbers.

It is this order of the Commission that petitioners now ask us to review and set aside.

The major contention advanced by petitioners is that there is no substantial evidence on the whole record to support the Commission's finding of an unlawful agreement to maintain prices. With this contention we are unable to agree.

At the outset it is noted that the pricing practices allegedly entered into by unlawful agreement were almost uniformly followed by petitioners. There was considerable testimony to the effect that members of the Association almost never engaged in net price selling. For example, a manufacturer witness testified: "It has been a good many years since I have known or heard of a manufacturer who sells an advertising specialty on a net price basis * * *", and a jobber witness testified: "I frankly do not know of any that are selling on a net price." In addition to this testimony, there was substantial documentary evidence that almost all manufacturers required list price maintenance by jobbers, and that jobbers adhered to these established list prices.

Petitioners called two witnesses who testified that price cutting from established lists took place, but the force of this testimony was weakened when it was developed under cross-examination that these witnesses deviated from list prices on only 5 per cent of sales in one case and on 5 or 8 per cent of sales in the other. The Association secretary, after conceding that it was "general practice" in the industry to maintain list prices, testified that he knew of "one or two" members who sold on a net price basis, but did not name them.

It is primarily on this ground—the failure of any substantial body of jobbers to deviate from list prices—that this case is distinguishable from Tag Manufacturers Institute v. F. T. C., 1 Cir., 1949, 174 F.2d 452, where we set aside an order of the Federal Trade Commission. There the Commission found as an over-all average that "approximately 25 per cent of the dollar volume of the aggregate total sales of all the subscribing manufacturers" had been at off-list

prices. See 174 F.2d at page 458. No comparable finding was made in this case, and, on the basis of the evidence presented to the Commission, no such finding was possible. Because the record before us discloses almost complete adherence to list prices, a decision to reverse cannot depend on the absence of uniformity of manufacturer or jobber behavior, but only on a failure of the evidence to support the Commission's finding that the virtual unanimity of pricing policy was the result of an unlawful agreement. (The second major issue in the Tag Manufacturers case related to the validity of the elaborate reporting system established by the Tag Manufacturers Institute. There is no evidence of such a reporting system in this case, and none is charged.)

■ It should be emphasized that, to affirm the order below, it is unnecessary for us to find a formal agreement among the jobbers or direct evidence of a conspiracy. "The agreement may be shown by a concert of action, all the parties working together understandingly, with a single design for the accomplishment of a common purpose." American Tobacco Co. v. United States, 6 Cir., 1944, 147 F.2d 93, 107, affirmed, 1946, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575. "As in the case of most conspiracies to restrain trade and destroy competition, there is no direct evidence of any express agreement to do what the law forbids; but no such evidence is required, nor is the commission required to accept the denials of those charged with the conspiracy merely because there is no direct evidence to establish it, for it is well settled that 'The essential combination or conspiracy may be found in a course of dealings or other circumstances as well as in any exchange of words.' Fort Howard Paper Co. v. Federal Trade Comm., 7 Cir., 156 F.2d 899, 905." Bond Crown & Cork Co. v. F. T. C., 4 Cir., 1949, 176 F.2d 974, 979. Cf. Interstate Circuit, Inc., v. United States, 1939, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610.

The documentary evidence advanced by the Commission to prove that an unlawful agreement existed consists, first of all, of group resolutions in which the jobbers group in one instance "records its desire to maintain manufacturers' published prices" and requests manufacturers to "state on their price lists the necessity for the jobber to maintain those prices", and in another instance requests manufacturers to mention in price lists that "list prices must be maintained" and not to send samples to nonconforming jobbers. These resolutions were forwarded to the manufacturers group meeting as an indication of the opinions of the jobbers. The manufacturers responded by expressing "complete accord" or by accepting "the spirit" of the requests. There is considerable evidence that there were many other occasions where the jobbers group discussed and condemned price cutting. For example, in its meeting of March 7, 1949, discussion resulted in the "concluding suggestion" that every effort should be made to hold the line on prices.

The record also contains documentary evidence of a so-called "campaign" by the jobbers to maintain list prices. At the meeting of the jobbers group of March 31, 1947, the secretary raised the issue of net price selling and suggested that the jobbers take "group action" on the topic. The jobbers discussed the question at their meeting and concluded that they were "in agreement" that net pricing was not sound for the industry and that there was a "joint responsibility" for correcting this. When informed of this action, the manufacturers group at its meeting stated that they were "in agreement with the Jobbers Group." The next fall, on October 10, 1947, a brief report was submitted to the manufacturers on the outcome of the "net pricer campaign' which had been approved by both jobbers and manufacturers" to the effect that the effort to dissuade some new manufacturers from selling at net prices had been favorably received. The enduring interest in eliminating net price selling is reflected in the secretary's recommendation a year later of a "persuasive educational en-

deavor" to alter the practice of those still adhering to net price selling.

In addition, there is uncontradicted evidence that jobbers would "police" one another, that is, report to a manufacturer any price cutting on his line. Further, the secretary of the Association developed a form letter which he sent to manufacturers reported to have sold on a net price basis. This letter strikes us as a particularly important item of evidence, reflecting not only the attitude of the jobbers and the Association towards price cutting, but also the nature of the steps taken to enlist manufacturer support. The pertinent portion follows:

"The purpose of this letter is to tell you of the jobber's disfavor of net prices and to show you the traditional, desired and safe method of presentation of prices to the advertising specialty industry. This action was requested at the recent meeting of the Jobbers Group of the Association.

"The established jobber knows that any advertising specialty sold on a net price basis very soon becomes a 'price football'—it will be sold at all kinds of prices—and that the salesmen's commission as well as the jobber's margin suffer thereby. The result is that products presented at a net price to jobbers are avoided by established jobbers. Selling effort is put on products that are presented in the usual manner and which, as a result, have greater stability.

"The worthwhile and responsible jobber will not handle a line unless the manufacturer sets and maintains the price. He cannot afford to put his selling efforts behind a product which is unstable pricewise.

"There is another reason, too, why 'net prices' are not acceptable. It is a legal reason and is based on federal law—the Robinson-Patman Act —popularly known as the anti-price-discrimination law. In view of es-tablished selling methods in the advertising specialty industry, this law requires that the manufacturers' established price be maintained. Hence, the effect of the law is that the manufacturer is responsible for the price at which his goods are sold. It is the manufacturer's responsibility to establish his prices to the ultimate buyer—the advertiser —and to insist that such prices are maintained.

"Thus, the safe and sound method of operating under these conditions is the customary way for this industry: The manufacturer to establish the price of his goods to the advertiser in the quantity ranges; and advise jobbers and salesmen what their discounts and commissions are for *selling these goods at these prices.*" (Emphasis in original.)

Finally, we refer to statements in both the jobbers and manufacturers manuals which recommend maintenance of resale prices and elimination of price cutting, and to general statements contained in the constitution and by-laws of the Association and in the member's creed to the effect that the purpose of the Association, among other things, was to "establish and maintain fair practices" and that each member believes "in the maintenance of established policies and selling prices."

Petitioners rely primarily on the testimony of Association, jobber and manufacturer witnesses denying that an agreement took place and supporting a differing interpretation from our own of the documentary evidence presented by the Commission and recited in part above. The Association's resolutions and discussions are represented as recommendations or a "consensus of opinion" as to good practice in the industry, a consensus which involved "absolutely no obligation" and which was not binding on anyone. Secondly, petitioners point to evidence that the secretary of the Association on two occasions cautioned the membership that they should not

participate in "collusive action" to fix prices. Finally, it is argued, consistently with the findings of the hearing examiner, that the Association's constitution and the member's creed were "general, platitudinous, bland and indefinite" and "were not taken seriously."

A balanced reading of the evidence, taken in conjunction with the fact that the overwhelming majority of sales actually were on list prices, leads us to the conclusion that there is substantial evidence on the whole record to support the Commission's findings. The strong and continuous interest of the jobbers in perpetuating a system of list prices is indisputable. It is to be expected that petitioners' witnesses would deny that there was an agreement, but this testimony does not offset in our judgment the quite compelling documentary evidence of a planned common course of action or understanding among the jobbers which can be properly characterized as an "agreement" within the doctrine of the Bond Crown & Cork Co. and American Tobacco Co. cases, supra. We have here far more than mere parallelism in business behavior, which of itself might not justify a finding of conspiracy, and it suffices to point to the evidence quoted above to dispose of petitioners' claim that the Association served solely as a forum for the "good old American custom" of "grousing."

■■ Petitioners present a series of specific arguments in defense of their conduct, none of which, however, impairs the conclusion that an agreement existed and that such agreement was unlawful. They first maintain that there was no coercion of either jobbers or manufacturers, and that this indicates that no agreement existed. But it is settled that no provision to compel adherence to an unlawful agreement is necessary to invalidate it under the Federal Trade Commission Act, see F. T. C. v. Pacific States Paper Trade Ass'n, 1927, 273 U.S. 52, 62, 47 S.Ct. 255, 71 L.Ed. 534, and this rule would seem to apply squarely to the alleged agreement or un-

derstanding among the jobbers. It is arguable, however, that because the Commission specifically found that the jobbers "required" the manufacturers to engage in illegal pricing practices, the court, in order to sustain the Commission, must find evidence of coercion. In fact the record is not lacking in such evidence. It is first noted that the jobbers were the customers of the manufacturers and that any reliable indication, such as a group resolution or the form letter quoted above, that the jobbers felt strongly about particular business practices, was bound to have a substantial persuasive effect on the manufacturers. This conclusion is buttressed by testimony from petitioners' own witnesses that concerted action by jobbers would influence manufacturers, indeed, that jobbers "would whip [an errant manufacturer's] ears down and bring him into line and tell him the facts of life very quickly." Apart from general statements of the effect of jobber action upon manufacturers, there is evidence that economic coercion existed specifically with respect to price maintenance. For example, a jobber witness testified: "I will not select a line of an advertising specialty that is offered to me on a net price basis."

■ Petitioners next point out that the use of list prices had been traditional in the industry long prior to 1940, the beginning of the period covered by the complaint. Even if this be so, it does not alter the result. In the first place, it is not clear that this "traditional practice" was itself legal, for a prohibited conspiracy may have existed before 1940. Secondly, whether or not the pre-1940 practice was the result of individual or joint action would not affect our conclusions concerning post-1940 behavior if price maintenance since 1940 was founded on an unlawful agreement. In other words, even if the practice of list pricing started legally, it could nevertheless have become the subject of a conspiracy if, after the Association became active, there was an improper agreement to keep prices at an elevated level.

A third argument advanced by petitioners is that there were "business reasons" for list price selling as well as for the practice of individual manufacturers' urging their jobbers to observe list prices. But the existence of sound business reasons for selling at uniform prices is not a defense to a proven conspiracy to fix prices. United States v. Masonite Corp., 1942, 316 U.S. 265, 276, 62 S.Ct. 1070, 86 L.Ed. 1461; cf. United States v. Socony-Vacuum Oil Co., Inc., 1940, 310 U.S. 150, 221–222, 60 S.Ct. 811, 84 L.Ed. 1129. It is arguable, however, that the presence of business reasons may be evidence that each jobber or manufacturer arrived independently at the identical conclusion that list price selling was beneficial, thus negating the inference of an unlawful conspiracy. The two business reasons offered by petitioners are (1) that manufacturers like to have their products offered to different customers at the same price for the same quantities, and (2) that because a jobber might handle the products of as many as 150 manufacturers, if he had to compute mark-ups and issue his own price list it would impose a tremendous clerical and mechanical burden on him. The first reason is unacceptable because a rule adopted on this basis would completely frustrate enforcement of both the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note and the Federal Trade Commission Act, 15 U.S.C.A. § 41 et seq. by permitting manufacturers so inclined to prevent any price competition on their products. The second reason is logically sound, but because petitioners introduced no testimony to prove that this clerical problem was either widespread or in fact the basis of list price selling by the individual manufacturers, the Commission had a right to disregard it in the light of substantial evidence pointing to another conclusion.

A fourth argument of petitioners is that no conspiracy existed because any price maintenance flowed from the impression of Association members that the Robinson-Patman Act, 15 U.S.C.A. §§ 13, 13a required manufacturers to establish and maintain uniform list prices. This impression of the law by members of the Association was translated into periodic "Robinson-Patman Resolutions" which recorded their belief that the Robinson-Patman Act required manufacturers to establish and maintain uniform list prices. Even if adherence to list prices stemmed from such an innocent misapprehension of the meaning of the Robinson-Patman Act, it is legally irrelevant. The purity of petitioners' motives is immaterial if in fact they were engaged in an unlawful combination banned under the Federal Trade Commission Act. Cf. Eugene Dietzgen Co. v. F. T. C., 7 Cir., 1944, 142 F.2d 321, 329.

A fifth issue presented by petitioners concerns the right of manufacturers to fair-trade their products under the McGuire Act, 66 Stat. 632. Although it is not clear precisely what objection petitioners raise in this connection, any possible difficulty is effectively overcome by the following proviso in the Commission's order:

"Provided, however, that nothing herein shall be interpreted as prohibiting a manufacturer from establishing and maintaining resale prices on its products in any manner exempted from the prohibitions of the Federal Trade Commission Act by the McGuire Act."

Sixth, we might comment on the fact, stressed by petitioners, that they represent only a minor part of the advertising specialty industry and that all manufacturers engaged solely in direct selling have been dismissed as defendants in this action. While this may suggest that the Commission's order perhaps will not have a substantial effect on the advertising specialty industry as a whole, it cannot bar proceedings to eliminate whatever unlawful practices do exist. Whether the statutory scheme devised by the Congress to ensure price competition operates unfairly or unevenly with reference to a specific segment of a particular industry is a considera-

tion of policy which must be addressed to Congress, not to the courts.

The other major issue raised by petitioners is a challenge to the jurisdiction of the Commission over those members of the Association who were not named in or served with the complaint. This contention must be rejected, however, on either one of two independent grounds. First of all, the unnamed petitioners, including foreign members of the Association, were in fact represented by counsel at the hearing. The evidence to this effect is substantial and consists of (a) the letter of appearance for petitioners' counsel, dated March 24, 1952, which covered "all respondents * * * except Kromex Industries, Inc."; (b) the stipulation as to identification, authenticity and genuineness of certain documents entered into on April 24, 1952 which was "between the Federal Trade Commission and Advertising Specialty National Association and its members, respondents in the above entitled matter"; and (c) statements by petitioners' counsel at the hearing before the Commission that he was representing the entire membership of the Association. In short, there is ample support for the Commission's finding that the unnamed petitioners were in fact represented by counsel, and we are able to dispose of the jurisdictional argument on this ground. Cf. California Lumbermen's Council v. F. T. C., 9 Cir., 1940, 115 F.2d 178.

Secondly, even if the unnamed petitioners were not represented by counsel, the proceeding was a proper class suit and the named respondents were representative of the entire class. Petitioners do not challenge the Commission's general authority to proceed in class suits, see Chamber of Commerce of Minneapolis v. F. T. C., 8 Cir., 1926, 13 F.2d 673, but do maintain that, of the three traditional requisites for proper class suits, the instant action fails to support a finding of two of them: (a) That the members of the Association were so numerous as to make it impracticable to bring all of them before the Commission. In this proceeding petitioners constitute a class of over 300 members, which appears a sufficient number to fall within the accepted legal test of the "impracticability" of joining them as respondents. Tisa v. Potofsky, D.C.S.D.N.Y.1950, 90 F.Supp. 175 (50 held impracticable); Gonzales v. Sheely, D.C.D.Ariz.1951, 96 F.Supp. 1004 (300 held impracticable). This conclusion is strengthened by the fact that the members of the Association were not fixed in number, but changed from year to year. "Impracticability" does not mean "impossibility," but only the difficulty or inconvenience of joining all members of the class. See Pacific Fire Ins. Co. v. Reiner, D.C.E.D.La.1942, 45 F.Supp. 703. 3 Moore's Federal Practice 3423 (2d ed. 1948). The finding here must be supported, particularly in view of the doctrine that the determination of "impracticability" is a matter of the trial court's (or in this case the Commission's) discretion, not to be upset in the absence of clear abuse. Pelelas v. Caterpillar Tractor Co., 7 Cir., 1940, 113 F.2d 629, certiorari denied 1940, 311 U.S. 700, 61 S.Ct. 138, 85 L.Ed. 454; Weeks v. Bareco Oil Co., 7 Cir., 1941, 125 F.2d 84, 90; Rank v. Krug, D.C.S.D.Cal.1950, 90 F.Supp. 773, 805.

(b) The named respondents were representative of the entire class. Petitioners urge that, because the products manufactured and sold were not comparable and because there were elements of individuality among the members of the organization, the respondents therefore were unrepresentative of the entire class.

It is the unity of interest among members of the class which is controlling. "In determining the question [of adequate representation] the court must consider (1) whether the interest of the named party is co-extensive with the interests of the other members of the class; (2) whether his interests are antagonistic in any way to the interests of those whom he represents; (3) the proportion of those made parties as compared with the total membership of the

class; (4) any other factors bearing on the ability of the named party to speak for the rest of the class \* \* \*." 3 Moore's Federal Practice 3425 (2d ed. 1948).

■ We have no doubt that the class suit in this case is valid under the above criteria. The members of the Association have common and consistent interests and have considered themselves part of "an integrated industry—manufacturing and jobbing—all within a common boundary;" the proportion of those made parties seems adequate; and no reasons have been presented which would detract from the ability of the named parties to speak for the entire class. Cf. Chamber of Commerce of Minneapolis v. F. T. C., supra, 13 F.2d 673.

■ Finally, foreign members of the Association are properly bound by the Commission's order. Petitioners first argue that the Commission made no finding that eight foreign companies that were members of the Association did business in the United States or otherwise were subject to Commission jurisdiction. This is erroneous, for the Commission listed no exceptions to its finding that the members of the Association were engaged in interstate commerce. Petitioners' major point is invalid because it is established that foreign as well as domestic companies may be subject to federal anti-trust decrees, Timken Roller Bearing Co. v. United States, 1951, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199; United States v. Imperial Chemical Industries, Ltd., D.C.S.D.N.Y.1951, 100 F.Supp. 504, and that in a proper class suit the fact that all members of the class are not within the jurisdiction of the court where the suit is tried does not exempt foreign members from the judgment. Supreme Tribe of Ben-Hur v. Cauble, 1921, 255 U.S. 356, 367, 41 S.Ct. 338, 65 L.Ed. 673; Fitzgerald v. Dillon, D.C.E.D.N.Y.1950, 92 F.Supp. 681. See Hart and Wechsler, The Federal Courts and the Federal System 934–35 (1953).

The order of the Federal Trade Commission is affirmed.